756 A.2d 608 (2000)
333 N.J. Super. 537
LEGGE INDUSTRIES, a Division of Anneg Builders, Inc., A New Jersey Corporation, Plaintiff-Appellant,
v.
JOSEPH KUSHNER[1] HEBREW ACADEMY/JKHA; Palent Construction Co., a New Jersey Corporation, Defendants-Respondents,
Pond, Inc., a New Jersey Corporation, Defendant.
Colonial Concrete Co., A New Jersey Corporation, Plaintiff-Appellant,
v.
Joseph Kushner Hebrew Academy/JKHA; Palent Construction Co., A New Jersey Corporation, Defendants-Respondents,
Pond, Inc., a New Jersey Corporation, Defendant.
Premco Construction Co., A New Jersey Corporation, Plaintiff-Appellant,
v.
Joseph Kushner Hebrew Academy/JKHA; Palent Construction Co., a New Jersey Corporation, Defendants-Respondents,
POND, INC., a New Jersey Corporation, Defendant.
Superior Court of New Jersey, Appellate Division.
Argued October 27, 1999.
Decided July 27, 2000.
*610 Charles A. Strenk, Morristown, argued the cause for appellants Legge Industries, Colonial Concrete Co. and Premco Construction Co. (Kiernan & Strenk, attorneys; Mr. Strenk on the brief).
Stephen M. Charme, Florham Park, argued the cause for respondent Joseph Kushner Hebrew Academy, Inc., (Witman, Stadtmauer & Michaels, attorneys; Mr. Charme and Ruth R. Schwartz, on the brief).
Faith A. Ullmann, Parsippany, argued the cause for respondent Palent Construction Co. (Slavitt Simon & Neuer, attorneys; Richard I. Simon, of counsel and Ms. Ullmann on the brief).
Before Judges BAIME, EICHEN and WECKER.
*609 The opinion of the court was delivered by WECKER, J.A.D.
This appeal concerns the interpretation and application of the Construction Lien Law, N.J.S.A. 2A:44A-1 to -38 (the Lien Law)[2] to lien claims filed against a property owner by several suppliers to a defaulting contractor. We conclude that summary judgment was erroneously granted in favor of defendants, and we reverse.

I.
In 1995, defendant Joseph Kushner Hebrew Academy ("JKHA") undertook to build a new day school on its property in Livingston Township. JKHA entered into a written contract with defendant Palent, Inc. to oversee the project as the construction manager. JKHA also entered into a written agreement with Pond, Inc. to perform the necessary masonry work on the new building. Three of Pond's suppliers, plaintiffs Legge Industries, Colonial Concrete Co., and Premco Construction (collectively "plaintiffs"), delivered concrete and other building materials to Pond at the building site between October 1, 1995 and January 16, 1996, all to be used in the construction of the new school.[3]
Palent and JKHA became dissatisfied with Pond's work on the project, and on January 2, 1996 Palent issued a notice of default to Pond, allowing Pond three days (as permitted by its contract) in which to cure the default. On January 5, 1996, JKHA terminated Pond's contract in writing for failure to cure the default. With Palent's knowledge and consent, Pond apparently continued work on the project until early March, when Palent officially *611 assumed responsibility for completing the masonry work, as permitted by JKHA's contracts with both Pond and Palent. Palent completed the work left unfinished by Pond, however, despite Palent's promise to complete the work for no more than Pond's contract price, JKHA paid Palent significantly more than the unpaid balance of the Pond contract. Pond has since ceased doing business and apparently is insolvent.
Plaintiffs, who share common corporate management and ownership, collectively claim $80,619 in unpaid invoices for materials supplied to the JKHA construction project. After attempting unsuccessfully to obtain payment from Pond, on January 23, 1996 each of the plaintiffs filed a construction lien claim against JKHA's interest in the property. N.J.S.A. 2A:44A-6. Legge filed a claim for $59,764.63. Colonial filed a claim for $17,611.70 and Premco filed a claim for $3,243.76. Each plaintiff filed a timely complaint to enforce its lien claim. N.J.S.A. 2A:44A-14a. JKHA filed a bond pursuant to N.J.S.A. 2A:44A-31 to secure the liens and to satisfy its construction lender. Plaintiffs' complaints were consolidated, and JKHA and Palent filed answers, affirmative defenses and cross-claims for indemnification against each other. Default was entered against Pond for failure to respond to interrogatories or requests for production of documents.
After completion of discovery, Palent and JKHA filed a joint motion for summary judgment, alleging that plaintiffs' lien claims were not based upon a mutually binding, written agreement as required by N.J.S.A. 2A:44A-3; that the claims were willfully overstated and should be forfeited pursuant to N.J.S.A. 2A:44A-15; that JKHA incurred costs greater than the original contract price with Pond in order to complete the project, thereby using up the retainage withheld under the Pond contract; and that because no money was due and owing to Pond, no lien fund existed pursuant to N.J.S.A. 2A:44A-10 from which plaintiffs' lien claims could be satisfied. With regard to the claimed exhaustion of the lien fund, defendants argued that the Pond contract called for total payment of $551,049; that as of January 10, 1996 (five days after terminating Pond) JKHA had paid Pond a total of $385,000; and that in order to complete Pond's work, JKHA was required to pay Palent not only the remaining $156,817 that would have been due Pond for completion, but an additional $38,446.
Plaintiffs filed a cross-motion for summary judgment. In support of their motion and in opposition to defendants' motion, plaintiffs alleged with respect to the lien fund that two separate payments by JKHA to Pond were wrongfully or negligently paid, that plaintiffs had a priority right to the Pond retainage and that the sums represented by the improper payments and the retainage, amounts totalling $78,993.76, should be deemed available for the benefit of Pond's unpaid suppliers including plaintiffs. Plaintiffs also argued that their deliveries to Pond were evidenced by signed delivery slips, invoices and/or statements of account, that Pond made partial payment on their respective accounts, and that these writings satisfied the contract requirement of the Lien Law with respect to each plaintiff's lien claim. Plaintiffs further argued that their lien claims included only the amounts of their unpaid invoices and therefore cannot be deemed "wilfully overstated."
With respect to the three challenged payments, the first improper payment alleged by plaintiff concerns a $13,928 overpayment to Pond by JKHA in December 1995. Plaintiffs characterize this payment as an unwarranted "advance payment," for which JKHA is not entitled to a credit to reduce the lien fund. Defendants admit the $13,928 overpayment in December, but contend that it was an innocent mistake, not an improper advance,[4] and that Pond *612 subsequently completed sufficient work to have earned the payment before plaintiffs filed their lien claims on January 23, 1996. JKHA therefore argues that that $13,928 is not available to satisfy plaintiffs' claims.
Second, plaintiffs cite JKHA's $22,154.36 payment to Pond, on or about January 10, 1996, against Pond's December 30, 1995 requisition. Plaintiffs claim that because relations between Palent, JKHA and Pond had deteriorated to the point that Pond had been given a notice of default on January 2, 1996, and a termination notice on January 5, and because the JKHA/Pond contract provided that upon Pond's termination it "shall not be entitled to receive any further payment" until the project's completion, Palent had no right on January 4, 1996 to authorize payment and JKHA had no right on January 10 to issue a check to Pond for $22,154.36.
Further, plaintiffs claim that Palent and JKHA had actual knowledge, at least as of January 3, 1996, that Pond had not paid Legge, Colonial or Premco. In support of that claim, plaintiffs cite a letter dated January 3, 1996 from Murray Palent, a principal of Palent, to Joseph Belott, a principal of Pond, listing various unpaid invoices upon which Pond owed payment, including plaintiffs'. In that letter, Palent stated that as JKHA's agent, it would authorize JKHA to issue joint checks to Pond and its suppliers in order to insure payment to those suppliers. Plaintiffs' outstanding invoices were listed in that letter in the following amounts:

Legge $47,181.04
Colonial $15,199.10
Premco $ 4,848.76
 __________
Total $67,228.90

On January 4, Palent instructed JKHA to pay Pond's payment request of $92,428.60 by writing joint checks totaling $70,274.24 to several union funds and to one contractor, with the balance of $22,154.36 to Pond directly.[5] No checks were authorized to plaintiffs.
Plaintiffs contend that the $22,154.36 payment was collusive based upon the close business relationship between Pond and Palent. JKHA does not dispute plaintiffs' allegation that Pond actually continued at the job site with Palent's knowledge and approval until March 1996, long after Pond's purported termination; and up until the time Palent officially replaced Pond on the job. According to plaintiffs, whether this last $22,154 was properly paid to Pond was a material issue of fact requiring the judge to deny summary judgment.
Finally, plaintiffs argue that JKHA cannot deprive Pond's suppliers of the benefit of a lien fund by using the retainage to pay Palent. Under the retainage provision of the JKHA/Pond contract, JKHA was to pay Pond ninety percent of the "value of the work performed and materials incorporated into the job" as the work progressed, with the remaining ten percent, the retainage, to be paid "thirty (30) days after the completion of the building and acceptance by [JKHA] and upon submission of the evidence by [Pond] ... that all bills and claims against [Pond] for labor and for materials furnished in connection with this order have been paid."
The parties agree that Pond's work as of January 1996 was "significantly behind schedule"; that defendants were entitled to terminate Pond as it did on January 5; and that as of January 5, JKHA held *613 retainages against the total Pond contract totaling $42,911.40. Palent officially took over Pond's work on the school construction on March 1, 1996. Sometime after March 1, 1996, and well after plaintiffs had filed their lien claims, JKHA paid Palent the full $42,911.40 retained from Pond, plus an additional sum in excess of $38,000, allegedly to finish Pond's work on the project. Defendants claim that those payments were properly paid in order to complete the project.
The trial judge heard argument on May 1, 1998 and granted summary judgment to defendants on the ground that the "lien fund" had been exhausted, and based upon § 10 of the Lien Law, plaintiffs' liens therefore could not attach to JKHA's property. The court found no evidence of collusive payments between JKHA, Palent and Pond. The court expressly concluded that because two of JKHA's challenged payments to Pond (the $13,928 and $22,154 payments) were made prior to the filing of plaintiffs' liens, those payments were immune to plaintiffs' challenge. The court also found that under the JKHA/Palent contract, Palent had the right to use the Pond retainage funds to complete the project. Finally, the court found that apart from the exhaustion of the lien fund out of which plaintiffs theoretically could be paid, plaintiffs' lien claims were "grossly exaggerated" in violation of the Lien Law, N.J.S.A. 2A:44A-15, and therefore should be forfeited. Pursuant to the fee-shifting provisions of the Lien Law, N.J.S.A. 2A:44-15(a), the trial court awarded $6,840.97 in counsel fees to Palent.[6]
On appeal, JKHA and Palent defend the motion judge's conclusions that no lien rights attach to the extent of JKHA's payments to Pond before January 23, 1996; no lien rights attach to the retainage later paid over to Palent to complete the job; plaintiffs' liens are invalid and should be forfeited under section 15 of the Lien Law; and summary judgment therefore was properly granted to defendants.
Defendants have also raised an argument on appeal that was raised in the Law Division but not addressed by the Law Division Judge. Defendants argue that by filing lien claims alleging an October 1, 1995 contract that its principal later admitted was a "mistake," plaintiffs' lien claims must be forfeited under § 15 of the Lien Law in that they are "not filed in substantially the form" required by the Law. As we shall explain below, that issue cannot be resolved on this record and requires a remand for fact-finding. We therefore must address the other grounds upon which summary judgment was granted.

II.
We are informed on this appeal by the Supreme Court's recent decision in The Thomas Group, Inc. v. Wharton Senior Citizen Housing, Inc., 163 N.J. 507, 750 A.2d 743 (2000). However, this appeal raises several issues of first impression under the Lien Law, including:
 Is the "lien fund" that is available to satisfy suppliers, and thus the property owner's maximum liability to those claimants, reduced by premature or otherwise unearned payments to the prime contractor, as long as they were made before the suppliers' liens were filed?
 After a prime contractor's default,[7] is the owner's contractual right to use the retainage to complete the job superior to a lien claimant's right against the retainage?
 Are signed delivery receipts and/or statements of account sufficient writings under the Lien Law to establish a valid supplier's lien claim?
 What constitutes a willful overstatement of a lien claim that triggers forfeiture of the lien? *614  If a verified lien claim alleges a nonexistent written contract, but that claim is supported by other sufficient writings, does the misstatement require forfeiture of the lien?
We hold that a property owner's maximum liability under the Lien Lawthe "lien fund"is not reduced by payments to the contractor that were not earned and due before the suppliers' liens were filed; that suppliers' lien claims to the retainage on the prime contract take priority over the owner's rights in the retainage; that the writing required as a basis for filing a supplier's construction lien can be satisfied by signed delivery slips, but not by evidence of partial payment on an invoice for the materials supplied; that a willful overstatement requiring forfeiture of a lien claim is one that is overstated in bad faith, and not one made in a good faith mistake of fact or law; that forfeiture of a lien claim based on the claimant's alleging a non-existent written contract depends upon whether the claimant's allegation was made in bad faith; and that a remand is required in this case to consider each question in light of the standards enunciated.

A.
We first address the question whether the "lien fund" was properly reduced by the two challenged JKHA payments to Pond before January 23: $13,928 paid by mistake in December 1995 and $22,154 paid on January 10 (after Pond's termination but before plaintiffs' lien claims were filed). The Supreme Court has unequivocally recognized "the lien fund concept" set forth at N.J.S.A. 2A:44A-10.[8]See Thomas Group, 163 N.J. at 521, 750 A.2d 743. Section 10 of the Lien Law does not use the term "lien fund," but § 23 of the Lien Law describes payment of lien claims "out of the lien fund." N.J.S.A. 2A:44-23. It is § 10 that defines the limits of the owner's liability for liens filed under the Act.[9] In Thomas Group the Court describes the protection that § 10 affords the property owner:
Underlying the lien fund concept is the principle that an owner, contractor, or subcontractor should not be compelled to pay twice for the same work or services when a valid lien claim is filed. The statute provides that an owner's property is never subject to liens in an amount greater than the amount unpaid by the owner to its prime contractor at the time the lien claim is filed by one claiming a lien through that prime contractor. N.J.S.A. 2A:44A-10(a). Thus, while obtaining lien waivers is a prudent practice, an owner that does not require a contractor to furnish lien waivers *615 for subcontractors or suppliers ultimately is protected against double payment because no lien rights attach once payment for the work is made to the contractor.
[163 N.J. at 521, 750 A.2d 743 (emphasis added).]
We do not read the Court's explanation of the principle "[u]nderlying the lien fund concept" to mean that every payment to the prime contractor before the lien claim was filed automatically reduces the owner's liability to a lien claimant, no matter what the circumstances of the payment. Implicit in the Court's statement of the principle underlying the lien fund concept is that the owner is protected to the extent of all payments due and paid to the prime contractor in good faith before the lien was filed.
Plaintiffs' contention that two of JKHA's pre-January 23 payments to Pond remain available to the "lien fund" rests upon the assumption that the phrase "less the amount of payments made" that appears in both § 10a and § 10b of the statute, describing the sum to be subtracted from the contract price to determine the limit of the owner's liability (and thus the available lien fund), implicitly means "less the amount of payments duly made." We agree with that interpretation and read Thomas Group, referring to the owner's protection "against double payments," to say that "no lien rights attach once payment for the work is [duly] made to the contractor."
We see no evidence that the Legislature or the Supreme Court intended to permit a property owner to defeat a supplier's potential lien claim by either knowingly or negligently advancing payments to its prime contractor that were not yet due under its contract. See International Tel. and Tel. Corp. v. Envirco Servs. Inc., 144 N.J.Super. 31, 36-37, 364 A.2d 549 (App.Div.1976) (interpreting the now repealed Mechanics' Lien Law, N.J.S.A. 2A:44-78)(hereinafter ITT). In ITT, we held that "[i]n the absence of evidence of advance payments to the general contractor which are contrary to the filed contract provisions, or other collusive conduct designed to frustrate the rights of the ... claimant," id. at 36-37, 364 A.2d 549 (emphasis added), the property owner was not liable to an unpaid subcontractor because the owner owed nothing to the breaching general contractor as of the date of the sub-contractor's stop notice.[10]See also James Falcone Plumbing and Heating Co., Inc. v. Pasquale, 26 N.J.Super. 285, 290-92, 97 A.2d 720 (App.Div.1953) (addressing the express prohibition of the repealed Mechanics' Lien Law against advance payments inconsistent with the payment schedule and holding that "generally such payments cannot be charged against the [lien] fund...."). In James Falcone we also concluded "as a just and practical corollary" that any such advance payment nevertheless may be charged against the lien fund if work justifying the amount of the advance payment was actually performed before the filing of the stop notice.[11]Id. at 292, 97 A.2d 720.
Defendants contend that Pond earned the mistaken $13,928 overpayment before January 23 and the payment therefore properly reduced the lien fund. The motion judge made no finding in that regard, *616 presumably because he concluded that any payment made before January 23 reduced the lien fund and was unavailable to satisfy plaintiffs' claims. We cannot determine on this record whether Pond ever earned the additional $13,928 and if so, when.
With respect to the January 10 payment, plaintiffs allege collusion between Palent and Pond, based upon undisputed evidence that Palent directed JKHA to make various payments to Pond on January 10, notwithstanding that as of January 3, 1996 Palent had actual knowledge that plaintiffs (and others) had unpaid invoices to Pond. Palent's knowledge is evidenced by its letter to Pond, describing itself "[a]s the owner's agent," listing the outstanding invoices, stating its intention to "instruct the owner to issue joint checks," and seeking Pond's "written authorization to issue a joint check."
In assessing whether the lien fund that caps JKHA's liability to plaintiffs legitimately has been exhausted, and whether material issues of fact precluded summary judgment on that issue, evidence of a subsequent dispute between JKHA and Palent is relevant. On March 1, 1996, Palent confirmed in writing to JKHA that "[a]ll work being performed and cost incurred by Palent Construction Company to complete Pond, Inc. contract at the Joseph Kushner Hebrew Academy will not exceed the contract amount of Pond, Inc." Nevertheless, Palent apparently charged JKHA substantially more than the total price under the Pond contract, and JKHA seeks credit against the lien fund for the amount it actually paid Palent to complete Pond's job.
In July 1996 JKHA terminated Palent as construction manager, alleging among other things Palent's failure to properly supervise and insure Pond's timely performance and payments to its suppliers. Disputes between Palent and JKHA over Palent's performanceboth as construction manager and as successor on the Pond contractwere apparently submitted to binding arbitration under the rules of the American Arbitration Association pursuant to paragraph nine of the Palent contract with JKHA. The record is devoid of evidence of the outcome of that arbitration.
In opposition to defendants' summary judgment motion, plaintiffs alleged that "any cost `overrun' is as a result of breach of contract between JKHA and Palent, as asserted by JKHA itself [in the arbitration proceeding]." The motion judge apparently did not attach significance to JKHA's allegations in its arbitration against Palent that Palent recommended Pond to JKHA, urged JKHA to keep Pond on the job after the January termination letter, and even hid from JKHA Pond's continued involvement with the project until March 1996, all to further its own separate interest in maintaining a business relationship with Pond. In light of our holding with respect to the retainage, we are not directly concerned with the cost overrun.[12] However, without expressly arguing the doctrine of judicial estoppel, we infer that that is the import of plaintiffs' argument with respect to JKHA's claim that collusion in Palent's instruction to JKHA to make the January 10, $22,154.36 payment to Pond bars a credit against the lien fund in that amount. ITT, 144 N.J.Super. at 36-37, 364 A.2d 549; James Falcone, 26 N.J.Super. at 291-92, 97 A.2d 720.
We cannot determine on this record whether the $13,928 paid in error was earned before Pond's termination on January 5. Nor can we determine the circumstances behind the $22,154 payment on January 10. Arguably, mere knowledge of Pond's indebtedness to its suppliers, in the absence of filed lien claims, may be insufficient *617 to extend the owner's liability, see Thomas Group, 163 N.J. at 521, 750 A.2d 743, at least in the absence of collusion against the suppliers. See ITT, 144 N.J.Super. at 36-37, 364 A.2d 549. However, the record permits (although it does not require) an inference of collusion that should have precluded summary judgment based upon exhaustion of the lien fund.[13]

B.
We next address the parties' respective claims to priority in the disposition of the retainage. As of January 5, when Pond was terminated, JKHA had retained $42,911.40 against Pond's requisitions on the contract under their contract provision for retainage. Article Twenty of the Pond contract with JKHA established Palent's and JKHA's right to take over the job and JKHA's right (in relation to its obligation to Pond) to use the entire unpaid balance on the contract to complete the job in the event of Pond's default.[14] Article Twenty further provides that in the event of Pond's default and termination, JKHA is not required to make any further payments to Pond until completion of the work under the contract, and then only if the expense of completion does not exceed the contract balance. In essence, Article Twenty is an additional retainage provision.
Plaintiffs challenge JKHA's use of that $42,911.40 to pay Palent for completing Pond's work. Plaintiffs contend that turning over the retainage "breached a constructive trust on these retained funds on which materialmen such as Legge, Colonial and Premco were entitled to rely under the Construction Lien Law and New Jersey case law." More appropriately stated, the issue is JKHA's right to reduce the lien fund by the retainage amount where JKHA used more than that amount to complete the job.[15]
As the Court said in Thomas Group, "no provisions in the statute address the interaction between the statute and contractual retainage clauses." 163 N.J. at 515, 750 A.2d 743. In Thomas Group it was unnecessary *618 for the Court to address that interaction further, because the issue involving retainage in that appeal was limited to whether a lien claim was premature and subject to forfeiture under § 15 of the Lien Law because it was filed before the contractor had met every condition to receiving final payment (including the retainage amount). The Court answered that question in the negative, recognizing
two competing interests ..., each worthy of protection. On the one hand, we have the contractor, who having performed substantially all of its work, seeks the protection of its statutory lien claim and superiority over claimants junior in priority. On the other hand, we have the owner's interest in not being compelled to pay the contractor until all of the bargained for prerequisites to payment are satisfied. Our task is to fashion protections for both interests, if it can reasonably be done, within the four corners of the statutory scheme.
[163 N.J. at 518-19, 750 A.2d 743.]
We are informed by the Court's determination, in the absence of statutory or common law guidance, to "focus primarily on the statutory provisions and [an] understanding of the policies underlying the Lien Law," id. at 515, 750 A.2d 743, in order to resolve the competing interests in this case. Those competing interests are plaintiffs' interest in being paid for materials already delivered and the owner's interest in paying only once for the same job.
We look first to § 10 of the Lien Law, as well as to the Court's opinion in Thomas Group, to resolve those competing interests. Section 10 limits the owner's maximum liability to lien claimants by defining and formulating the so-called lien fund. That formula begins with the prime contract price, reduced by payments made on the contract before receipt of the filed lien claim. As stated in Thomas Group, the owner is protected by limiting its exposure to the unpaid portion of the contract price. 163 N.J. at 521, 750 A.2d 743. Here the unpaid portion clearly includes the $42,000 retainage, irrespective of our view of the two challenged pre-lien-filing payments discussed earlier in this opinion. The § 10 formula does not reduce the lien fund by any post-lien-filing payments to the prime contractor. The question is whether subsequent payments to a successor contractor should affect the formula or lead to a different result. We find no reason to reach such a conclusion.
If JKHA had not terminated Pond's performance, JKHA would have been justified in withholding periodic payments from Pond to cover the liens filed by plaintiffs on January 23. Indeed, had JKHA failed to do so and made payments to Pond after January 23, JKHA would not have been protected against double payment and would have been liable to lien claimants and subject to foreclosure on valid filed liens. The situation here is complicated by Pond's termination and Palent's succession to the Pond contract.
The Lien Law attempts to protect both the owner and the supplier, but includes no specific provision regarding contractual retainage. Nor do we find any express legislative history to assist us in discerning the probable legislative intent. We therefore address the issue by balancing the competing interests in the light of the apparent purposes of the Lien Law.
The Construction Lien Law substantially reflects the September 1982 Report to the Governor of the State of New Jersey entitled "Report and Legislative Recommendations of the Mechanics' Lien Law Study Commission" ("Study Commission Report"), which includes among the stated objectives[16] of its legislative recommendations: *619 1. to achieve a more equitable balancing of the respective interests of land, labor and capital;
2. to continue to provide an extraordinary remedy to those who supply work and materials (e.g., contractors, subcontractors, suppliers, workmen) in the improvement of real property, which remedies are in addition to and not intended to detract from the rights and remedies otherwise available to these and other parties pursuant to contract and common law.

....
9. to remove the uncertainty, lack of clarity and ambiguity of the current New Jersey practices and replace them with procedures and rights which are clearly defined, clearly understandable to the public and the industry, and clearly limited to specified amounts so as to cause the least interruption to construction activities and cash flow;
10. to permit the continued reliance of certain industries upon their lien rights, in order to afford credit to those who otherwise could not obtain it.
While no clear statement affecting the disputed priorities can be found in these objectives, it is plain that the limited, secondary status of the stop notice claimant was intentionally eliminated by the new Lien Law in the interest of both simplifying the practice and fairly balancing the competing interests. The question boils down to which of two innocent parties, the owner or the supplier, should bear the risk of loss. We reject JKHA's reliance on ITT, decided under the repealed Mechanics' Lien Law, where we held with respect to conflicting claims of an owner and a stop notice claimant that
the claim of the owner who expends money to complete the structure following default of the contractor is superior to that of stop notice claimants, unless the contract dictates otherwise. James Falcone Plumbing & Heating Co. v. Pasquale, 26 N.J.Super. 285, 289, 97 A.2d 720 (App.Div.1953); Post v. Geldziler, 105 N.J.L. 370, 145 A. 323 (E. & A. 1929); see Stone Post Co. v. Corcoran, supra, 80 N.J.L. [549] at 551, 77 A. 1031. Hence, in this case the owner's priority consumed the total contract fund, leaving nothing to which a stop notice claim could attach, regardless of the post-default payments by the owner.
[144 N.J.Super. at 38, 364 A.2d 549.]
The long-standing rule that the owner has priority over the stop-notice claimant has its rationale in the premise that "a stop notice operates as an assignment Pro Tanto of the money due the contractor .... [and the] rights of the stop notice claimant therefore can rise no higher than the rights of the general contractor, unless the owner has acted in violation of his duty [under] N.J.S.A. 2A:44-85 [not to pay the contractor in advance or for the purpose of defeating a lien]." ITT, 144 N.J.Super. at 37, 364 A.2d 549. See also Brown v. Home Devel. Co., 129 N.J. Eq. 172, 175, 18 A.2d 742 (Ch.1941); Anderson v. Huff, 49 N.J. Eq. 349, 354, 23 A. 654 (Ch. 1892); Reeve v. Elmendorf, 38 N.J.L. 125, 127 (Sup.Ct.1875). A stop notice claimant under the Mechanics' Lien Law by definition held a far less favorable position than a lien claimant.[17]See A.C. Constr. Co., Inc. v. Kehoe, 260 N.J.Super. 58, 61-62, 615 A.2d 271 (App.Div.1992). We have found no case holding that a lien claimant has such limited protection.
To the extent that we are writing on a clean slate on this issue, we are *620 satisfied that the lien fund, that is, the § 10 definition of the owner's maximum liability to satisfy a supplier's claims, includes the contractual retainage, whether or not the prime contractor remains on the job. Moreover, as a matter of equity, if there has been a default by the prime contractor after delivery of the supplier's goods, a covering contractor's price to complete the project should reflect the materials already on hand. Thus the owner's actual risk of double payment is likely to be minimized under the priority rule we announce, whereas a contrary rule, denying the supplier's priority in the retainage, is likely to assure the supplier's loss. In Thomas Group, the Court described lien statutes as
remedial and ... designed to guarantee effective security to those who furnish labor or materials used to enhance the value of the property of others, and, where the terms of the statute reasonably permit, the law should be construed to effect this remedial purpose.
[163 N.J. at 517, 750 A.2d 743 (quoting J.R. Christ Const. Co., Inc. v. Willete Assocs., 47 N.J. 473, 477, 221 A.2d 538 (1966)).]
We hold therefore that the owner's use of the retainage to make post-lien-filing payments to a successor contractor does not reduce the lien fund. Of course, our holding is limited to private property owners. It does not apply to liens arising under the Municipal Mechanics' Lien Law, N.J.S.A. 2A:44-125 to -142. Compare, Johnson v. Fred L. Emmons, Inc., 115 N.J. Eq. 335, 170 A. 850 (Ch.1934), aff'd o.b., 119 N.J. Eq. 88, 181 A. 24 (E. & A.1935).
Because the lien fund cannot be reduced by the $42,000 retainage, and because an evidentiary hearing is required to determine whether the $13,928 payment in December or the $22,154.36 payment in January should reduce the lien fund, we are satisfied that summary judgment for defendants was not justified on the ground that the lien fund had been exhausted.

III.
We therefore turn to the motion judge's alternate ground for granting summary judgment to defendants: "gross exaggeration" of the lien claims requiring forfeiture. The judge found that Legge overstated its claim by approximately $30,000, adopting defendants' argument that Legge's signed delivery slips accounted for only $29,000 of its claimed contract. The judge found that Colonial and Premco had no written contract, implicitly rejecting their contention that Pond's partial payments on their written invoices and statements of account, made without objection to the total, established that the statements were sufficient written evidence of their contract to satisfy the Lien Law.
The Construction Lien Law entitles a supplier to a lien on the owner's real property for materials provided "pursuant to a contract," "for the value of the ... materials... furnished in accordance with the contract and based upon the contract price," N.J.S.A. 2A:44A-3. The term "contract" is defined as
any agreement, or amendment thereto, in writing, evidencing the respective responsibilities of the contracting parties, which, in the case of a supplier, shall include a delivery or order slip signed by the owner, contractor, or subcontractor having a direct contractual relation with a contractor, or an authorized agent of any of them.

[N.J.S.A. 2A:44A-2.]
The phrase "any agreement ... in writing" is modified by the phrase "evidencing the respective responsibilities of the contracting parties." In the case of a materials supplier, the statute expressly provides that the required writing can be satisfied by a signed delivery slip. The parties dispute whether the agreement itself must be spelled out in a separate written contract document or whether other written evidence of an agreement with the prime contractor is sufficient. The *621 language of the statute supports the more flexible interpretation urged by plaintiffs; we hold that a writing evidencing the agreement satisfies the Lien Law. Moreover, the words "shall include" are words of inclusion, not exclusion. See Cuna v. Board of Fire Comm'rs, Avenel, 42 N.J. 292, 304-05, 200 A.2d 313 (1964). Thus we conclude that § 2 does not necessarily limit to delivery slips the writings allowable as evidence of a supplier's contract.
To the extent that the statute may be deemed ambiguous on this point, we look to the apparent purposes of the contract requirement. Those purposes are to insure that no lien, with its serious consequences,[18] can be placed on the owner's property without a reasonable basis in fact, and to discourage false claims.
As to Legge, the judge accepted defendants' challenge to the authority of the person(s) signing the delivery slips. Defendants argue that of the thirty-three signed delivery slips (representing materials billed at a total of $56,294), none were signed by an authorized agent of Pond, but in fact may have been signed by "individuals on the job site who were simply acknowledging delivery." However, defendants have never claimed that the goods were not delivered, or that they were not used in this project.[19] In fact, defendants' Law Division brief alleges that plaintiffs continued to deliver to the site even after Pond admitted its inability to pay.
Signed delivery receipts are sufficient writings under the statute. N.J.S.A. 2A:44A-2. The Study Commission's comments on the definition of "contract" contained in its recommendation makes it clear that while an oral contract is insufficient basis for a lien claim, "delivery tickets constitute a writing." Study Commission Report at 16. We offer no opinion whether separate delivery slips covering the entire claim necessarily are required to establish the full amount of a supplier's claim, nor are we convinced that this issue necessarily can be resolved on affidavits. We therefore remand for further consideration of the sufficiency of the delivery slips to support Legge's contract claim. On remand, the court may consider the sufficiency of the signatures, with due regard to the doctrine of apparent authority.
The rule is that the principal is bound by the acts of his agent within the apparent authority which he knowingly permits the agent to assume, or which he holds the agent out to the public as possessing. The question in every case depending upon the apparent authority of the agent is whether the principal has by his voluntary act placed the agent in such a situation that a person of ordinary prudence, conversant with business usages and the nature of the particular business, is justified in presuming that such agent has authority to perform the particular act in question; and when ... the party, relying upon such apparent authority, presents evidence which would justify a finding in his favor, he is entitled to have the question submitted to the jury.
[American Well Works v. Royal Indemnity Co., 109 N.J.L. 104, 108, 160 A. 560 (E. & A.1932).]
As an alternative ground for granting summary judgment, the motion judge found that plaintiffs forfeited their lien *622 claims pursuantto § 15 of the Lien Law.[20] He concluded that the Legge lien claim was "grossly exaggerated" because he found that the 33 signed delivery slips Legge relied on to establish a written contract represented only a small portion of Legge's claim (the judge referred to $29,000 out of the total claimed), which he found "would be a violation of the statute which makes ineffective liens which are filed under such circumstances." The record does not support the motion judge's conclusion that only $29,000 of Legge's claim is supported by a signed delivery slip.[21]
We therefore need not decide whether finding Legge's lien claim "grossly exaggerated" was equivalent to finding the claim "willfully overstated," as defendants contend. We merely note that a willful overstatement connotes an intent to recover that to which the claimant knows he is not entitled; in other words, a claim made in bad faith. See, e.g., Friedman v. Stein, 4 N.J. 34, 44, 71 A.2d 346 (1950)(interpreting what constitutes a "willful and intentional[y]" false lien claim under the Mechanics' Lien Law). On remand the court must consider whether any excess amounts found to have been set forth in the filed lien claims represent good faith disputes of law or fact, in contrast to willful overstatements.
As to Premco and Colonial, the judge found "No ... written contract to support the claims ... to any extent ...." thereby implicitly rejecting plaintiffs' argument that statements of account that were received and not contested by Pond constitute sufficient evidence of their contract. The judge apparently concluded that the statements of account and invoices relied upon by Colonial and Premco were insufficient writings to support their lien claims, despite evidence of partial payment and no evidence that the statements or invoices were disputed by Pond.[22]
Defendants do not dispute that the plaintiffs' statements and invoices were sent to Pond as alleged, nor do they dispute that the materials were in fact delivered and used in constructing the building. Nevertheless, the statutory requirement that a contract evidenced by a writing is a prerequisite to a lien claim reflects the serious consequences of a filed claim and the importance of tangible evidence that "will reduce the factual proof problems in litigated matters and provide a sound basis for third parties to evaluate the merits of the lien claim." Study Commission Report at 16. Without necessarily limiting the required writing in the case of a supplier to a signed delivery slip, we hold that an invoice that does not evidence the site or project to which materials have been delivered is not a sufficient writing upon which to base a lien claim. We therefore affirm the summary judgment dismissing the lien claims filed by Colonial and Premco. *623 Defendants' final challenge to the validity of plaintiffs' lien claims is based on § 15a, which provides in pertinent part:
If a lien claim is without basis, the amount of the lien claim is willfully overstated, or the lien claim is not filed in substantially the form or in the manner or at a time not in accordance with the provisions of this act, the claimant shall forfeit all claimed lien rights and rights to file subsequent lien claims to the extent of the face amount claimed in the lien claim.
Defendants cite the lien claims filed on behalf of each plaintiff pursuant to N.J.S.A. 2A:44A-8. Section 8 of the Lien Law prescribes the required form and contents of a lien claim. On each claim form, Martin Lucibello alleged material supplied "pursuant to a written contract... dated October 1, 1995, between [the claimant] and Pond, Inc." The verification signed by Lucibello includes the following acknowledgment:
The foregoing statements made by me are true, to the best of my knowledge. I am aware that if any of the foregoing statements made by me are false, this construction lien claim will be void and that I will be liable for damages to the owner or any other person injured as a consequence of the filing of this lien claim.
However, in answer to Interrogatories propounded by defendants, plaintiffs subsequently admitted that the allegation of their Superior Court complaints regarding a October 1, 1995 written contract was "in error and the initial order pursuant to which materials and labor were delivered to Pond, Inc. was made verbally" by Pond. Defendants' brief in the Law Division admitted plaintiffs' October 1 oral contract with Pond. JKHA argues that Lucibello falsified the lien claim forms by asserting that each lien was filed pursuant to a written contract dated October 1, 1995 when in fact no such written contract existed. Although defendants raised this argument in favor of forfeiture in the Law Division, the motion judge did not address this ground for determining that plaintiffs' liens were to be forfeited. Where the honesty, accuracy or completeness of a filed lien claim is challenged, an evidentiary hearing may be required to determine whether the claimant has made an honest mistake or whether the claimant filed in bad faith, and therefore whether the forfeiture provision applies.
We note that in opposition to defendants' motion for summary judgment, Lucibello did not submit any further explanation for his "mistake." Nevertheless, with respect to Legge's lien claim, the record suggests that signed delivery slips supporting substantially all of Legge's claim constitute sufficient written evidence of its contract with Pond. We decline to rule on defendant's forfeiture contention and direct the Law Division on remand first to address the question whether Legge's citation to an October 1, 1995 contract constituted a bad faith deviation from "the form or ... the manner" prescribed by the Lien Law. The court shall conduct an evidentiary hearing on that issue if warranted.

IV.
We reverse the order for summary judgment dismissing Legge's claim, affirm the order for summary judgment dismissing the Colonial and Premco lien claims, affirm the order denying summary judgment to plaintiffs, and remand for further proceedings consistent with this opinion.

APPENDIX[23]
SCOPE OF COMMISSION'S CHARGE
Pursuant to Governor Brendan T. Byrne's order of January 14, 1981, the Mechanics' Lien Law Study Commission was created to study the statutory procedures and remedies available, in both private *624 and public construction, under the State's mechanics' lien laws, and to develop recommendations that "will satisfy all elements of industry and labor and the financial community" consistent with the fostering of the "continued development of construction projects within the State of New Jersey."
OBJECTIVES OF COMMISSION'S LEGISLATIVE RECOMMENDATIONS
It was the unanimous opinion of the Commission that encouragement of the investment, and safeguarding of the respective interests of land, labor and capital in real estate development will enhance the business climate, and increase job and business opportunities and public revenues in the State of New Jersey. To this end, the statutory scheme recommended by the Commission seeks:
1. to achieve a more equitable balancing of the respective interests of land, labor and capital;
2. to continue to provide an extraordinary remedy to those who supply work and materials (e.g., contractors, subcontractors, suppliers, workmen) in the improvement of real property, which remedies are in addition to and not intended to detract from the rights and remedies otherwise available to these and other parties pursuant to contract and common law;
3. to protect the interests of a property owner who has fulfilled his contractual obligations to his contractor or contractors in good faith;
4. to assure that the statutory rights created by the proposed legislation are readily available to statutory beneficiaries, without having to resort to daily legal advice in confronting a complicated, unclear and confusing statute, upon which a mistaken impression could easily cause an unwitting loss of statutory rights or improper impairment of another's rights;
5. to protect the prudent and honest contractor from interruption of his cash flow and the deprivation of his rightful construction monies where he faithfully fulfills his contractual obligation to his subcontractors and suppliers;
6. to protect the prudent and honest contractor where the indebtedness sought to be secured is too remote from that contractor's ability to assure avoidance of the creditor's plight;
7. to better reflect and be more responsive to the current business setting of New Jersey, rather than making the construction industry a captive of outdated law;
8. to recognize and clearly designate the priority of mortgagees as to construction advances made in the course of a project so as to encourage the flow of construction monies into the growth of New Jersey businesses and development of real property;
9. to remove the uncertainty, lack of clarity and ambiguity of the current New Jersey practices and replace them with proceduresand rights which are clearly defined, clearly understandable to the public and the industry, and clearly limited to specified amounts so as to cause the least interruption to construction activities and cash flow;
10. to permit the continued reliance of certain industries upon their lien rights, in order to afford credit to those who otherwise could not obtain it;
11. to assure the property owner that any improper imposition of lien claims upon his or her property would result in the owner's complete financial restoration from such an event, including attorney's fees, damages, and the forfeiture of the claimant's lien rights;
12. to make a clear and unequivocal statement to the industry that exaggerated, untimely and statutorily barred lien claims which interfere with the free flow of construction monies and the legal rights of *625 the parties to a construction project, will no longer be tolerated.
NOTES
[1] The party's name was incorrectly spelled "Kershner" in the caption of the briefs and we therefore correct it.
[2] The Construction Lien Law was enacted by L. 1993, c. 318, effective April 22, 1994 and replaced and repealed the Mechanics' Lien Law, N.J.S.A. 2A:44-64 to -104 and N.J.S.A. 2A:44-106 to-124.1.
[3] Premco last delivered materials to the job site on November 30, 1995. Colonial last delivered materials on January 15, 1996. Legge's last delivery occurred on January 16, 1996.
[4] Defendants explain that Pond submitted two applications for payment in December 1995, each listing a "current payment due" as well as a "balance to finish." In each case, JKHA paid the amount stated as "balance to finish" instead of the "current payment due," thereby exceeding the payments actually due by $13,928.
[5] Although the check for $22,154.36 was actually drawn payable jointly to Pond and "J.M. Miele," there is no evidence in the record to suggest that "J.M. Miele" was a supplier or sub-contractor separate from Pond or that this payment did not inure directly to Pond's benefit. The six checks were drawn in the amounts $22,154.36; $29,865.15; $2,511.29, $6,637.66; and $26,260. Plaintiffs challenge only the $22,154.36 payment and not the other January 10 payments, apparently because the other checks were jointly payable to undisputed claimants.
[6] JKHA made no application for fees.
[7] We use the term "prime contract" to describe a construction contract between the property owner and any contractor. See, e.g., Thomas Group, 163 N.J. at 521, 750 A.2d 743.
[8] The concept is not synonymous with a constructive trust, as plaintiffs argue.
[9] Section 10 limits the owner's liability to an amount defined as follows:

a. In the case of a lien claim filed by a contractor, the total amount of the contract price of the contract between the owner and the contractor less the amount of payments made, if any, prior to receipt of a copy of the lien claim pursuant to section 7 of this act, by the owner to the contractor or any other claimant who has filed a lien claim or a Notice of Unpaid Balance and Right to File Lien pursuant either to a contract with the contractor and any subcontractor or supplier, or a contract between a subcontractor of the contractor and any supplier or other subcontractor; or
b. In the case of a lien claim filed by a subcontractor or supplier, the amount provided in subsection a. of this section, or the contract price of the contract between the contractor or subcontractor and the subcontractor or supplier, as applicable, pursuant to which the work, services, materials or equipment is provided by the subcontractor or supplier, less the amount of payments made, if any, prior to receipt of a copy of the lien claim pursuant to section 7 of this act, to the contractor or supplier or any other claimant who has filed a lien claim or a Notice of Unpaid Balance and Right to File Lien pursuant to a contract with such subcontractor or supplier, whichever is less.
[N.J.S.A. 2A:44A-10 (footnote omitted).]
As suppliers, plaintiffs' claims are governed by § 10b.
[10] As noted below in this opinion, a stopnotice claimant under the Mechanics' Lien Law had only the status of an assignee of the prime contractor. Id. at 37, 364 A.2d 549.
[11] The stop notice was an alternative remedy provided to subcontractors and suppliers by the Mechanics' Lien Law. The stop notice procedure did not permit enforcement of the claim against the property, but only permitted the claimant to bring suit to stop the owner from making any further payments to the prime contractor. See footnote 17 infra. The stop notice procedure has been eliminated as part of the easing of procedures and simplification of the remedies available to sub-contractors and suppliers under the new Lien Law. See Robert S. Peckar, New Jersey Institute for Continuing Legal Education, The New Construction Lien Law, 7 (1994).
[12] The record does not reveal whether defendants themselves or the arbitrator(s) determined the amount JKHA owed Palent, nor does the record reveal whether a fair allocation was made between the amount due for Palent's work to complete the Pond contract and the amount due for Palent's work as construction manager. Nevertheless, plaintiffs do not raise that issue.
[13] Plaintiffs argue before us that circumstantial evidence of defendants' collusion to deprive plaintiffs of their claims can be found in the fact that JKHA wrongfully paid out $78,993 (the sum of the three challenged payments), a sum roughly equivalent to plaintiffs' total lien claims of $80,620 (the sum of the Legge, Colonial and Premco claims). We deem it an equally available inference that plaintiffs challenged these three payments because that total would create a lien fund that would approximate plaintiffs' lien claims. We therefore find no error in the motion judge's failure to draw such an inference.
[14] Article Twenty of the Pond contract with JKHA provides, in pertinent part:

Construction Manager or The Owner shall have the right, after three days' written notice to the Contractor, to terminate this Purchase Order and provide any such labor or materials and to deduct the cost thereof from any money due or thereafter to become due to the Contractor.
If after compliance with the first 3 day notice, Contractor subsequently fails to properly or diligently complete the work provided for herein, Palent Construction Company or The Owner may at its option and upon one day's written notice declare this Purchase Order breached by said Contractor. Contractor shall be responsible for all damages to Palent Construction Company and/or the Owner.
Upon termination of the Contractor's employment as aforesaid, Palent Construction Company or The Owner may enter upon the premises and take possession, for the purpose of completing the work included under this contract, of all materials, tools and appliances thereon, and to employ any other person or persons to finish the work and provide the materials therefore, and in case of such discontinuance of the employment of the Contractor, he shall not be entitled to receive any further payment until the said work shall be wholly finished, at which time, if the unpaid balance of the amount to be paid under this order shall exceed the expense incurred by the Construction Manager or The Owner in finishing the work, such excess shall be paid by the Owner to the Contractor; but if such expense shall exceed such unpaid balance, the difference shall be charged to the Contractor.
[15] We recognize that retainage provisions in a construction contract are also intended to protect the owner, as security for the prime contractor's performance.
[16] The Scope and Objectives of the Commission are set forth in an Appendix to this opinion.
[17] The Mechanics' Lien Law gave the property owner the unilateral option of filing its prime contract with the County Clerk, thereby limiting subcontractors and suppliers claiming through that contract to the remedy of a "stop notice" in place of a lien. A "stop notice" claimant had no lien upon and there fore could not foreclose upon the real property in order to collect the amount claimed, but could only stop the owner from disbursing further payments to the prime contractor until the "stop notice" claimant's right to the funds was resolved. See A.C. Constr. Co., 260 N.J.Super. at 61-62, 615 A.2d 271.
[18] The 1982 Study Commission Report recognized "that the lien claim has the most serious ramifications to the property owner as well as to all other parties to the construction project...." See Study Commission Report at 20.
[19] Defendants also argue that one invoice from Legge dated October 20, 1995, No. 100237, for $25,025.51, represents a delivery more than 90 days before Legge's January 23, 1996, lien filing and therefore too remote to be included. We find no merit in this argument. N.J.S.A. 2A:44A-6 requires lien claims to be filed no later than ninety days "following the date the last work, services, material or equipment was provided for which payment is claimed."
[20] N.J.S.A. 2A:44A-15a provides:

If a lien claim is without basis, the amount of the lien claim is willfully overstated, or the lien claim is not filed in substantially the form or in the manner or at a time not in accordance with the provisions of this act, the claimant shall forfeit all claimed lien rights and rights to file subsequent lien claims to the extent of the face amount claimed in the lien claim. The claimant shall also be liable for all court costs, and reasonable legal expenses, including attorneys' fees, incurred by the owner, contractor or subcontractor, or any combination of owner, contractor and subcontractor, in defending or causing the discharge of the lien claim. The court shall, in addition, enter judgment against the claimant for damages to any of the parties adversely affected by the lien claim.
[21] Indeed, the copies of Legge's delivery slips submitted with plaintiffs' appendix, each bearing an invoice number and corresponding with Legge's account statement to Pond, appear to show signatures for all but a very few deliveries, representing a very small portion of Legge's lien claim.
[22] Compare N.J.S.A. 12A:2-201, barring a Statute of Frauds defense to a merchant who fails to dispute a written contract confirmation within ten days.
[23] From "Report and Legislative Recommendations of the Mechanics' Lien Law Study Commission" at 1-4 (September 1982 Report to the Governor of the State of New Jersey).