919 A.2d 145 (2007)
391 N.J. Super. 556
STATE of New Jersey, Plaintiff-Appellant,
v.
Michael LISA, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued November 8, 2006.
Decided April 4, 2007.
*146 Charles F. Clark, Assistant Prosecutor, argued the cause for appellant (Luis A. Valentin, Monmouth County Prosecutor, attorney; Mary R. Juliano, Assistant Prosecutor, of counsel and on the brief).
Edward C. Bertucio, Jr. argued the cause for respondent (Hobbie, Corrigan, Bertucio & Tashjy, attorneys; Norman M. Hobbie, Eatontown, of counsel and on the brief; Mr. Bertucio, on the brief).
Before Judges WEISSBARD, GRAVES and LIHOTZ.
The opinion of the court was delivered by WEISSBARD, J.A.D.
On June 24, 2005, after five days of testimony, a grand jury voted to indict defendant for third-degree possession of a controlled dangerous substance (CDS), N.J.S.A. 2C:35-10a(1) (count 1); third-degree possession of CDS with intent to distribute, N.J.S.A. 2C:35-5a(1) and b(5) (count 2); third-degree distribution of a CDS, N.J.S.A. 2C:35-5a(1) and b(5) (count 3); first-degree aggravated sexual assault, N.J.S.A. 2C:14-2a(7) (count 4); and *147 second-degree reckless manslaughter, N.J.S.A. 2C:11-4b(1) (count 5).
Thereafter, defendant moved to suppress physical evidence and statements and to dismiss the reckless manslaughter charge.
On April 27, 2006, the motion judge found: (1) that certain evidence (marijuana and a scale), which was found in defendant's dresser drawers, should be suppressed; (2) that statements made by defendant to the police should not be suppressed; and (3) that count 5 of the indictment (reckless manslaughter) should be dismissed. We granted the State's motion for leave to appeal the interlocutory order dismissing the reckless manslaughter indictment. Although our reasons differ from that of the motion judge, we affirm.

I
Several witnesses were called before the grand jury to testify to the events surrounding the death of A.R. The following includes facts asserted by witnesses during the five days of testimony on the matter.
At approximately 7:00 p.m. on Saturday, October 18, 2003, seventeen-year-old A.R. went to the home of twenty-year-old defendant Michael Lisa, purchased methadone from him, and ingested at least one tablet. Defendant had previously purchased fifty methadone pills from Doug Smith, to whom he had been referred by a co-worker. Each pill contained a forty-milligram dose, and was segmented in order that it might be easily broken into four separate pieces. According to Smith, at the time of purchase, defendant told him that he was purchasing the methadone for his personal use. Defendant explained to Smith that he knew the drug was used as a pain killer, knew that the drug was addictive, and knew that it should not be taken with alcohol.
A.R. was acquainted with defendant and had "hooked up" with him once or twice prior to October 18, 2003. After taking the first dose of methadone, A.R., along with numerous friends, then proceeded to attend several parties, where she drank wine and beer, and smoked marijuana.
A few hours later, A.R. began itching profusely, which is a symptom of methadone withdrawal. She announced to her friends that she wanted to go to defendant's home. Shortly before 3:00 a.m., A.R. and her friends arrived at the home of defendant. The group congregated in the basement where they drank beer and played guitar. A.R. sat on defendant's lap and flirted with him. Her pupils were almost fully dilated.
Apparently, A.R. continued to scratch herself and was described as being "wired." A.R. was heard saying that she "wanted more" and asking defendant "[i]s there any more?"
Approximately twenty-five minutes after her arrival at defendant's residence, A.R. and defendant began to go upstairs together. Several of A.R.'s friends wanted to leave, and A.R. was asked if she wanted to leave with them. She declined, held hands with defendant, and proceeded upstairs with him.
At this point, three of A.R.'s friends departed. Vinny Mercuri and Tom Spinelli remained. Shortly after defendant and A.R. were seen climbing the stairs, Mercuri went to look for A.R. The door at the top of the basement steps was unlocked. Mercuri proceeded through the door and up another flight of stairs where he came upon defendant's bedroom. The door was closed. Mercuri knocked on the door. When defendant opened the door, Mercuri saw A.R., who appeared to be intoxicated, leaning back on defendant's bed.
*148 Defendant told Mercuri that he and A.R. needed privacy. Mercuri asked, "[w]hat do you mean privacy?" A.R. stated that she and defendant needed to discuss something. Defendant closed the door and Mercuri went back to the basement.
After about ten minutes, Mercuri again attempted to go to speak with A.R. Again, the door at the top of the basement stairs was unlocked. Mercuri proceeded to defendant's bedroom. He knocked on the door, but no one answered. He did not hear any conversation or movement coming from the bedroom. The bedroom door was locked. Mercuri returned to the basement.
Soon thereafter, defendant came running down into the basement. He momentarily disappeared into a second room in the basement. Defendant did not communicate with Mercuri, Spinelli, or defendant's friend Adam Krentzman, who was also present but seemingly "passed out" on the couch. Mercuri attempted to follow the defendant. Yet, when he reached the top of the basement steps, the door, which was previously unlocked, was now locked. Mercuri and Spinelli left through another exit, which led directly to the exterior of the home.
At about 4:30 a.m. to 4:45 a.m., defendant entered the basement and woke his friend, Krentzman. Defendant told Krentzman, "I got a problem. Can you come upstairs?" When the two arrived at defendant's bedroom, Krentzman realized A.R. was passed out on defendant's bed. Krentzman described defendant as nervous. Defendant stated that he and A.R. had had sex and that after sex, while they were lying on his bed talking, A.R. passed out.
Defendant also explained that he had redressed A.R. by putting on her bra, underwear, and pants. In an attempt to awaken A.R., Krentzman and defendant shook her, slapped her face, and called her name. When A.R. remained unresponsive, Krentzman suggested they call 9-1-1. Defendant responded, "[m]aybe she'll sleep it off."
Defendant and Krentzman proceeded to fall asleep in the bed, with A.R. lying between them. Defendant and Krentzman awoke at 12:30 p.m. Once again, they tried to rouse A.R. They threw water on her and slapped her face. Other than a quiet snore, A.R. did not respond. Again Krentzman suggested calling 9-1-1. Defendant replied, "[w]ait it out, wait it out. See if she'll sleep it off."
Thereafter, defendant left the home and purchased ammonia to put under A.R.'s nose to revive her. The ammonia was not effective. Defendant also called a nurse, with whom he was acquainted, for advice on the situation. The nurse told defendant to call 9-1-1. Defendant ignored the nurse's advice.
Over the next several hours, defendant and Krentzman stayed in defendant's room, played video games, watched football, and periodically checked A.R. to "make sure she was okay." They also propped her up in the bed to help her breathe easier. Although she slumped over several times, defendant and Krentzman continued to prop her up. Occasionally, her head would twitch or slightly spasm.
During the early morning hours, before defendant summoned Krentzman, while defendant and A.R. were alone in defendant's room, A.R. and defendant crushed up one of defendant's forty-milligram methadone tablets and snorted it together. According to Krentzman, defendant believed he was responsible for A.R.'s condition because he thought the methadone was the cause of her inability to breathe. Krentzman explained that defendant did *149 not want to summon 9-1-1 because he was fearful of liability. Krentzman also stated that, based on statements made to him by defendant, Krentzman was "positive" that defendant had sex with A.R. at least twice that night, "possibly more."
Although defendant's parents were in the home during the entire course of events, defendant never revealed A.R.'s presence until emergency aid was finally summoned at approximately 5:00 p.m. Police arrived at 5:10 p.m. At that time, A.R. was unresponsive and unconscious. Defendant told police that A.R. and friends arrived at his home at approximately 3:00 a.m. and that it appeared they had been drinking alcohol prior to their arrival. He insisted that A.R. had not consumed anything at his home other than a pill she retrieved from a prescription bottle in her purse. Defendant told police that A.R. took this pill at 3:30 a.m.
Defendant further stated that he and A.R. "hung out" in his bedroom for twenty minutes before Krentzman joined them. Defendant told police that, while he and Krentzman were playing video games, A.R. fell asleep on his bed. At this time, defendant did not tell police that he gave A.R. methadone or that the two had sex. Later, defendant admitted to another officer that he had sex with A.R., maintaining that it was "regular" consensual intercourse.
While in defendant's bedroom, police observed a half-dollar sized stain on the bed sheet, which appeared to be blood. They also noticed several empty condom wrappers on the floor, and a blood stained tampon[1] as well as a marijuana-filled cigar blunt located in the waste basket.
Medics performed advanced life support until A.R. was transported by ambulance to Kimball Medical Center. Upon arriving at the hospital, A.R.'s temperature had fallen to eighty-seven degrees Fahrenheit. By that time, A.R. had a strong pulse, but a blood pressure could not be measured, and she was experiencing major organ failure.
A sexual assault examination was performed. The exam revealed numerous tears to the vagina, cervix, and perineal tissue, as well as one tear inside the anus. According to the State's nursing expert, a sexual assault examiner, these types of tissue tears cause significant pain. People engaged in sexual intercourse typically reposition themselves to minimize pain, if necessary. When a person does not (or cannot) move in order to reposition themselves, the likelihood of pain and injury increases. Particularly, with regard to the cervix, a substantial amount of force and trauma are required to cause it to tear. A.R.'s injuries were deemed to have occurred within twenty-four hours of the examination. The nurse testified that of the 150 patients she has examined and approximately 1,000 charts she has reviewed, A.R. suffered "by far the most injuries [she has] ever seen on one person after a report of an assault." She had only observed a tear of the cervix in one other case.
Specimens were retrieved from A.R.'s vagina, cervix, and anus, all of which tested positive for spermatozoa. DNA samples were taken from defendant and Krentzman for comparison purposes. Defendant was identified as the source of the DNA found in the vaginal specimen. The DNA contained in the cervical and anal specimens were determined to be a mixture *150 of A.R.'s DNA and defendant's DNA. Defendant was also identified as the source of semen found on the sheets and on A.R.'s pants. Krentzman was excluded as a possible contributor to all of the aforementioned specimens, except the specimen taken from A.R.'s bra.
By the time A.R. was admitted to the hospital, she had already suffered severe brain damage and was almost clinically dead. If paramedics had not administered CPR, A.R. would have died in defendant's bedroom. In the days that followed, she was on a respirator, her brain function ceased, and her major organ systems failed. A.R. died on October 29, 2003.
Upon conducting an autopsy, the medical examiner (M.E.) concluded that the cause of death was multi-organ system failure caused by ethanol and drugs. The causative drugs were methadone, methamphetamine, amphetamine and benzodiazepine. The M.E. specifically found that methadone contributed to A.R.'s death.
The M.E. explained that the methadone, alcohol consumption, and benzodiazepine all worked together to suppress A.R.'s ability to breathe properly. During the approximately twelve hours that A.R. was unconscious and without medical attention, the oxygen in her blood gradually decreased, eventually causing brain death. The M.E. concluded that A.R.'s chance of survival would have increased had medical attention been summoned when A.R. first lost consciousness between 4:30 a.m. and 5:00 a.m.

II
Defendant's motion to dismiss the reckless manslaughter count was based on the assistant prosecutor's charge to the grand jury, which was said to be legally deficient. Because of its importance to the discussion which follows, we set out the instruction in full:
One charge for your consideration in this case is reckless manslaughter. "A person is guilty of reckless manslaughter if he recklessly causes the death of another person." In order for you to determine whether the defendant should be charged with reckless manslaughter, you must decide whether evidence has been presented that shows (1) the defendant engaged in conduct that caused the victim's death, and (2) that the defendant did so recklessly.
The first element the defendant engaged in conduct that caused the victim's death. That's the first thing you have to look at. "Conduct means an action or omission or a series of actions or omissions. Action means a bodily movement, whether voluntary or involuntary. Omission means the failure to act. The law provides that criminal liability for an offense may not be based on an omission or a failure to act unaccompanied by action unless a duty to perform the omitted act is otherwise imposed by the law."
In this case, the State is alleging that the defendant had a duty to provide emergency medical care for the victim, A.R. He failed to perform that duty, and that failure was a cause of the victim's death. It's up to you to determine from the evidence whether there is probable cause that such a duty existed.
Insofar as the law of duty is concerned, I instruct you as follows. Generally one has no legal duty to aid another person in peril, even when that aid can be rendered without danger or inconvenience to himself. However, there are situations that give rise to a duty to act.
A person has a duty to act where he has voluntarily assumed the care of another and so secluded the helpless person *151 as to prevent others from rendering aid. For example, a duty to act may be triggered where the defendant takes the victim from a place where others might have taken care to prevent injury to her to a private place where the defendant alone is to provide such care. A duty to act may be triggered where the defendant makes statements or engages in conduct that prevents another person from seeking aid to the victim.
(2) A person has the duty to act when the person is responsible for placing the victim in the position of danger or peril. If the person knows or has reason to know that by his conduct he has caused bodily harm to another [so] as to make her helpless and in danger of further harm, the person is under a duty to exercise reasonable care to prevent such further harm.
Additionally, if a person doesn't act and subsequently realizes or should realize that it has created an unreasonable risk of physical harm to another, he is under a duty to exercise reasonable care to prevent the risk from taking effect.
As stated above, you must determine whether given the evidence that you have heard regarding the circumstances surrounding A.R.'s drug and alcohol ingestion and her loss of consciousness, the defendant had had a duty to timely provide emergency care for A.R. If you found the defendant did have the duty and then failed to discharge that duty, then you must determine whether the failure to provide emergency care caused A.R.'s death.
Causation has a special meaning under the law. To establish causation, you must find sufficient [facts] to support probable cause that the victim would not have died but for the defendant's failure to provide emergency care, and (2) A.R.'s death was within the risk of which the defendant was aware when he neglected to provide her emergency care.
In other words, the evidence must show that A.R.'s death was not such an unexpected or unusual result of the defendant's failure to provide medical care under the circumstances of this case that it would be unjust to hold the defendant liable for reckless manslaughter.
The last element is recklessness. A person who causes another's death does so recklessly when he is aware of and consciously disregards a substantial and unjustifiable risk that death will result from his act or omission, failure to act. The risk must be of such a nature and degree that considering the nature and purpose of defendant's conduct and the circumstances known to the defendant, a disregard of that risk is a gross deviation from the standard of conduct that a reasonable person would follow in the same situation.
That's assuming such conduct that the actor was aware of the risk he was creating and consciously disregarded that risk however much he may have hoped no harm would result he acting [sic] recklessly. In other words, you must find the defendant was aware of and consciously disregarded the risk his failure to provide emergency care to A.R. would result in A.R.'s death.
If you find the defendant was aware of the disregard of the risk of causing death, you must determine whether that risk that he disregarded was substantial and unjustifiable. In doing do, you must consider the nature and purpose of the defendant's conduct and the circumstances known to defendant, and you must determine whether in light of those factors defendant's disregard of that risk was a gross deviation from the conduct a reasonable person would have observed in defendant's situation.
*152 Defendant's motion to dismiss focused on that portion of the instruction that resulted from N.J.S.A. 2C:2-1b(2). The entire subsection reads as follows:
b. Liability for the commission of an offense may not be based on an omission unaccompanied by action unless:
(1) The omission is expressly made sufficient by the law defining the offense; or
(2) A duty to perform the omitted act is otherwise imposed by law, including but not limited to, laws such as the "Uniform Fire Safety Act," P.L.1983, c. 383 (C:52:27D-192 et seq.), the "State Uniform Construction Code Act," P.L.1975, c. 217 (C.52:27D-119 et seq.), or any other law intended to protect the public safety or any rule or regulation promulgated thereunder.
That portion of the language in (b)(2) beginning with the word "including" was added by a 1997 amendment. L. 1997, c. 180.

III
As the motion judge correctly stated, N.J.S.A. 2C:2-1b was based on section 2.01(3) of the Model Penal Code, which contains identical language. I The New Jersey Penal Code, Final Report of the New Jersey Criminal Law Revision Commission 14 (1971). The accompanying Commentary on this provision states:
4. Subsection b stated the conventional provision as to when omissions unaccompanied by action suffice for liability. The omission must be one of the two sorts: (1) it may be made expressly sufficient by the law defining the offense; or (2) it may arise out of a duty to perform the omitted act which is otherwise imposed by law. Thus, under the Code, as well as under existing law, the duty to act may arise under some branch of the civil law. See Wechsler and Michael, A Rationale of the Law of Homicide, 37 Colum. L.Rev. 701, 751 (1937). See also State v. O'Brien, 32 N.J.L. 169 (Sup.Ct.1867) (Failure of railroad switch-operator to perform employment duty).
[II New Jersey Penal Code, supra, at 39.]
Thus, there is little doubt that the drafters of our Penal Code intended that the duty to act could be found in "some branch of the civil law," which means the civil common law. Our Penal Code commentary is, in this respect, identical to the Model Penal Code Commentary.
Putting aside for the moment what the referenced "common law" might be, we turn to the 1997 amendment. Defendant argued that the phrase "otherwise imposed by law" was limited by the 1997 amendment to enacted legislation, including "any rule or regulation enacted thereunder," "intended to protect the public safety." The State countered that the phrase "otherwise imposed by law" includes duties flowing from the common law, including duties imposed by civil tort law. The 1997 amendment, the State argued, was not intended to narrow the meaning of the statute as originally enacted, but to clarify it. The motion judge, in a thoughtful oral decision, accepted defendant's argument, finding that the 1997 amendment effected a major change in the provision, precluding reliance on common law principles as a source of the duty to act required for liability based on a failure to act. Despite the judge's careful analysis, we disagree.
There is no legislative history concerning the amendment, only the unilluminating statement accompanying the law: "Establishes criminal offense dealing with violation of public health and safety statutes." Our task is to determine whether the amendment intended to *153 change the meaning of "otherwise imposed by law" to eliminate the inclusion of civil common law duties, as originally intended by the drafters of the Penal Code. As a general proposition, a change in a statute, whether by revision or, as here, by amendment, will only be construed to effect a change in the substance of the law if the Legislature's intent is clear. See State v. Kohler, 40 N.J.Super. 600, 606, 123 A.2d 881 (App.Div.), certif. denied, 22 N.J. 225, 125 A.2d 439 (1956); Borough of New Shrewsbury v. Block 105, Lot 11, 104 N.J.Super. 360, 365, 250 A.2d 53 (Ch.Div. 1969), aff'd o.b., 111 N.J.Super. 550, 270 A.2d 46 (App.Div.1970).
We discern no such legislative intent here. Indeed, we find the language of the amendment to evidence a clear intent to the contrary. The addition of the several specific laws, and others of like effect, is introduced by the phrase, "including but not limited to." Our courts have consistently held that the use of the term "include" signifies enlargement rather than limitation. Cuna v. Bd. of Fire Comm'rs, Avenel, 42 N.J. 292, 304, 200 A.2d 313 (1964); Fraser v. Robin Dee Day Camp, 44 N.J. 480, 485-86, 210 A.2d 208 (1965); Zorba Contractors, Inc. v. Hous. Auth. of the City of Newark, 282 N.J.Super. 430, 434, 660 A.2d 550 (App.Div.1995); Legge Indus. v. Kushner Hebrew Acad., 333 N.J.Super. 537, 559, 756 A.2d 608 (App. Div.2000). Even if there could be any doubt as to the proper meaning of "including" in the 1997 amendment, Cuna, supra, 42 N.J. at 304, 200 A.2d 313, the use of "but not limited to" clearly indicates that no change was intended in the meaning of "otherwise imposed by law" as it pre-existed the amendment. Indeed, we note the obvious: the statutes included by the amendment were already covered by the phrase, "otherwise imposed by law." Thus, while we do not divine the Legislature's purpose in the amendment, it does appear to have been superfluous.
For these reasons, we reject defendant's argument that the 1997 amendment eliminated civil common law principles as a basis for defining a duty the purposeful violation of which could be found to be conduct that, in turn, could provide the basis for a charge of reckless manslaughter.

IV
As a result, we next turn to a consideration of the applicable common law duty that the assistant prosecutor sought to describe in his charge to the grand jury. As one court has noted, "[t]he problem of establishing the duty to take action which would preserve the life of another has not often arisen in the case law of this country," Jones v. United States, 308 F.2d 307, 310 (D.C.Cir.1962), although it "has evoked considerable study." Ibid. at n. 7. Jones quoted "the most commonly cited statement of the rule," ibid., appearing in People v. Beardsley, 150 Mich. 206, 113 N.W. 1128, 1129 (1907):
The law recognizes that under some circumstances the omission of a duty owed by one individual to another, where such omission results in the death of the one to whom the duty is owing, will make the other chargeable with manslaughter. * * * This rule of law is always based upon the proposition that the duty neglected must be a legal duty, and not a mere moral obligation. It must be a duty imposed by law or by contract, and the omission to perform the duty must be the immediate and direct cause of death.
[Jones, supra, 308 F.2d at 310.]
The Jones court continued as follows:
There are at least four situations in which the failure to act may constitute *154 breach of a legal duty. One can be held criminally liable: first, where a statute imposes a duty to care for another; second, where one stands in a certain status relationship to another; third, where one has assumed a contractual duty to care for another; and fourth, where one has voluntarily assumed the care of another and so secluded the helpless person as to prevent others from rendering aid.
[Ibid.]
Jones itself involved the pre-arranged placement by a mother of her newborn infant into the care of defendant, a family friend who severely neglected and abused the child, leading to its death. Referring to its earlier formulation of the rule, quoted above, the court, in reversing defendant's convictions due to inadequate jury instructions, observed that the jury, on retrial, would have to decide whether the mother entered into a contract with defendant for the care of the child or whether the defendant "assumed the care of the child and secluded him from the care of his mother, his natural protector." Ibid. It has been noted by one court that "LaFave and Scott, in their work, suggest three other duties: The duty based upon creation of the peril, the duty to control the conduct of others and the duty of a landowner to act affirmatively to provide for the safety of those whom he invites onto his land." State v. Brown, 129 Ariz. 347, 631 P.2d 129, 132 (App.1981) (citing LaFave and Scott, Criminal Law, § 26 (1972)).
In West v. Commonwealth, 935 S.W.2d 315, 316-17 (Ky.App.1996), cited by the State in this appeal, the duty of care was found in a specific statute, while in Commonwealth v. Pestinikas, 421 Pa.Super. 371, 617 A.2d 1339 (1992), the duty was found in a contract to provide food and medical care for another. Id. at 1341. Finally, in State v. Brown, supra, the duty arose from the special relationship between defendant, who operated a boarding home, and the ninety-eight-year-old resident who died as a result of defendant's failure to provide special nursing care. 631 P.2d at 132. See United States v. Hatatley, 130 F.3d 1399, 1406 (10th Cir. 1997) (citing LaFave and Scott, Criminal Law § 3.12, at n. 84 (2d ed.1986)) (defendant had duty to man he helped to eject from car after beating him, and then leaving him beaten and shirtless in freezing weather); State ex rel. Kuntz v. Thirteenth Jud. Dist., 298 Mont. 146, 995 P.2d 951, 956 (2000) (citing LaFave and Scott, § 3.3(a)(5) at 288 (1986)) (after defendant stabbed the man she had lived with as husband and wife for six years, she had duty to summon medical assistance for him); State v. Morgan, 86 Wash.App. 74, 936 P.2d 20, 23-24 (1997) (defendant had statutory duty to render aid to his wife who had passed out from a drug overdose.)
Only one New Jersey decision addressed N.J.S.A. 2C:2-1b prior to its 1997 amendment. In State v. Bass, 221 N.J.Super. 466, 535 A.2d 1 (App.Div.1987), the defendant was convicted of aggravated manslaughter arising from the death of his three-year-old daughter following a brutal beating. The child's mother was similarly charged, and there was conflicting evidence as to which parent inflicted the beating. The mother was convicted in the same trial of murder and related charges, demonstrating the jury's belief that the mother directly caused the harm while the father was responsible as an accomplice. Of relevance to the present case, the father argued that the trial judge erred in instructing the jury that his purposeful failure to stop the mother from beating the child "was sufficient for a finding of guilt of murder or aggravated manslaughter." Id. at 488, 535 A.2d 1. We *155 rejected that contention, noting that the jury instruction in fact stated as follows:
Ladies and gentlemen, I also instruct you that if only one person committed the acts causing Shawn's death, the other can be deemed an accomplice to murder if you find that he or she was a natural parent or person having custody or control of the child or who otherwise assumed responsibility for him and that he or she purposely did nothing to stop the beating and did nothing with purpose or knowledge that the beatings by the other would result in Shawn's death or in serious bodily injury resulting in death.
Moreover, if you find that Renee Nicely caused Shawn's death but Allen Bass was a father or a person who assumed responsibility for Shawn with the purpose of [sic] knowing that the result would lead to his death or seriously [sic] bodily injury resulting in death, he must be found guilty of murder as an accomplice even if you find that Miss Nicely was not capable of forming the requisite state of mind or did not have the requisite intent to commit murder herself.
[Ibid. (Emphasis supplied).]
Finally, we concluded "that there was sufficient evidence in the record to infer that defendant was the father of [the victim] or at least on that fatal day he had assumed responsibility in part for the care of [the child]." Id. at 489, 535 A.2d 1. As a result, N.J.S.A. 2C:24-4a, became applicable, providing that:
Any person having a legal duty for the care of a child or who has assumed responsibility for the care of a child . . . who causes the child harm that would make the child an abused or neglected child as defined in R.S. 9:6-1, R.S. 9:6-3 and [N.J.S.A.] 9:6-8.21 is guilty of a crime of the third degree.
N.J.S.A. 9:6-1 provides that cruelty to a child may consist not only in the infliction of corporal punishment and unnecessary mental or physical pain or suffering, but also in "any willful act of omission or commission whereby necessary pain and suffering, whether mental or physical, is caused or permitted to be inflicted on a child." Ibid. Thus, defendant had a statutory duty, pursuant to N.J.S.A. 9:6-1, 9:6-3 and 9:6-8.21, "to prevent [the child's] painful death." Ibid. In support of that conclusion, we cited to State v. Muniz, 150 N.J.Super. 436, 375 A.2d 1234 (App.Div. 1977), certif. denied, 77 N.J. 473, 391 A.2d 488 (1978), a pre-Code case involving two parents convicted of abuse and neglect of their child in violation of N.J.S.A. 9:6-3, in which we concluded that defendant's conviction could be based on the failure of one parent to stop the assault by the other. Id. at 444, 375 A.2d 1234.
We have discussed Bass at length to underscore its inapplicability to the case under review. As the opinion makes clear, Bass involved a duty to act imposed by statute, not common law. Muniz, for the same reason, and because it did not involve the Penal Code at all, has even less applicability. Thus, we continue our search for the source of the duty sought to be imposed on defendant.

V
For emphasis, we repeat the pertinent portion of the grand jury instructions:
The first element the defendant engaged in conduct that caused the victim's death. That's the first thing you have to look at. "Conduct means an action or omission or a series of actions or omissions. Action means a bodily movement, whether voluntary or involuntary. Omission means the failure to act. The law provides that criminal liability for an offense may not be based on *156 an omission or a failure to act unaccompanied by action unless a duty to perform the omitted act is otherwise imposed by the law."
In this case, the State is alleging that the defendant had a duty to provide emergency medical care for the victim, A.R. He failed to perform that duty, and that failure was a cause of the victim's death. It's up to you to determine from the evidence whether there is probable cause that such a duty existed.
Insofar as the law of duty is concerned, I instruct you as follows. Generally one has no legal duty to aid another person in peril, even when that aid can be rendered without danger or inconvenience to himself. However, there are situations that give rise to a duty to act.
A person has a duty to act where he has voluntarily assumed the care of another and so secluded the helpless person as to prevent others from rendering aid. For example, a duty to act may be triggered where the defendant takes the victim from a place where others might have taken care to prevent injury to her to a private place where the defendant alone is to provide such care. A duty to act may be triggered where the defendant makes statements or engages in conduct that prevents another person from seeking aid to the victim.
(2) A person has the duty to act when the person is responsible for placing the victim in the position of danger or peril. If the person knows or has reason to know that by his conduct he has caused bodily harm to another [so] as to make her helpless and in danger of further harm, the person is under a duty to exercise reasonable care to prevent such further harm.
Additionally, if a person doesn't act and subsequently realizes or should realize that it has created an unreasonable risk of physical harm to another, he is under a duty to exercise reasonable care to prevent the risk from taking effect.
As stated above, you must determine whether given the evidence that you have heard regarding the circumstances surrounding A.R.'s drug and alcohol ingestion and her loss of consciousness, the defendant had had a duty to timely provide emergency care for A.R. If you found the defendant did have the duty and then failed to discharge that duty, then you must determine whether the failure to provide emergency care caused A.R.'s death.
The State based this instruction on several provisions of the Restatement (Second) of Torts, (1965), which read as follows:
§ 314. Duty to Act for Protection of Others The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action.
§ 314A. Special Relations Giving Rise to Duty to Aid or Protect.
. . . .
(4) One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other.
§ 321. Duty to Act When Prior Conduct is Found to be Dangerous.
(1) If the actor does an act, and subsequently realizes or should realize that it has created an unreasonable risk of causing physical harm to another, he is under a duty to exercise reasonable care to prevent the risk from taking effect.
(2) The rule stated in Subsection (1) applies even though at the time of the act *157 the actor has no reason to believe that it will involve such a risk.
§ 322. Duty to Aid Another Harmed by Actor's Conduct.
If the actor knows or has reason to know that by his conduct, whether tortious or innocent, he has caused such bodily harm to another as to make him helpless and in danger of further harm, the actor is under a duty to exercise reasonable care to prevent such further harm.
§ 324 Duty of One Who Takes Charge of Another Who is Helpless.
One who, being under no duty to do so, takes charge of another who is helpless adequately to aid or protect himself is subject to liability to the other for any bodily harm caused to him by
(a) the failure of the actor to exercise reasonable care to secure the safety of the other while within the actor's charge, or
(b) the actor's discontinuing his aid or protection, if by so doing he leaves the other in a worse position than when the actor took charge of him.
§ 326. Intentionally Preventing Assistance
One who intentionally prevents a third person from giving to another aid necessary to prevent physical harm to him, is subject to liability for physical harm caused to the other by the absence of the aid which he has prevented the third person from giving.
Although the dissent is correct that the grand jury instruction did not "recite its special reliance on the Restatement", the assistant prosecutor conceded at oral argument in the trial court that he was "relying on the Restatement of Torts for the proposition that a duty is created. . . ." Indeed, he specifically cited to and read § 322, quoted above. It is likewise clear that the judge understood the charge as being based on the Restatement, as reflective of common law principles.
While no New Jersey case has ever addressed the propriety of the Restatement as a source of legal duty underpinning a manslaughter charge, other jurisdictions have touched on this issue.
In Commonwealth v. Levesque, 436 Mass. 443, 766 N.E.2d 50 (2002), the defendants were indicted for involuntary manslaughter based on their having accidentally started a fire in a vacant warehouse where they were living and then failing to report the fire. As a result, six firefighters died in fighting the blaze. Id. at 53-54. The element of wanton or reckless conduct required for the involuntary manslaughter charge was premised on defendants' duty to act (to report the fire) under circumstances where an individual fails to exercise reasonable care to prevent the risk he created. Id. at 55-58. Specifically, the court found support for such a duty to act in the principles of § 321 of the Restatement, even though Massachusetts had yet to recognize § 321 explicitly as a basis for civil liability. Id. at 56-57. See also Commonwealth v. Marcelli, 14 Mass. App.Ct. 567, 441 N.E.2d 270 (1982). In People v. Oliver, 210 Cal.App.3d 138, 258 Cal.Rptr. 138 (1989), the defendant was charged with and convicted of involuntary manslaughter resulting from the death of a man whom she met at a bar, went home with, and aided in injecting heroin into his bloodstream by holding the spoon containing heroin. After he collapsed, defendant had her daughter drag the man out of the house where he was discovered the next morning, dead from a heroin overdose. Id. at 140. The victim was alive when he was taken outside and the defendant's daughter and friends checked on him during the evening and found that he had a pulse and was snoring. Id. at 140-41. *158 The prosecutor's theory was that the defendant was criminally negligent when she failed to summon medical aid for the victim and then abandoned him knowing that he needed medical attention. Id. at 141. In upholding the defendant's conviction, the court found a duty to act flowing from principles expressed in §§ 321 and 324 of the Restatement. Id. at 142-44. Although no California case in a criminal context had ever applied the duty to take affirmative action to render aid, id. at 143-44, the court was satisfied "that the rules governing the imposition of a duty to render aid or assistance as an element of civil negligence, are applicable to the imposition of a duty in the context of criminal negligence." Id. at 144. See also State v. Brown, supra, 631 P.2d at 131; Flippo v. State, 258 Ark. 233, 523 S.W.2d 390, 393-94 (1975).
Only a few New Jersey decisions have addressed the duty to render aid to another. The decisions that have faced the issue have generally done so only in the context of a pre-existing relationship that gave rise to a duty to render assistance. As the court noted in Poole v. Janeski, 259 N.J.Super. 83, 84, 611 A.2d 169 (Law Div. 1992):
Traditionally, a person is under no duty to protect another person or control that person's conduct unless a special relationship exists between the two. Restatement (Second) of Torts, § 314-320 (1965). Parties will be found to share a special relationship, thus giving rise to a duty, when one person has control of another, when the person's own conduct has created a perilous situation, or where one has voluntarily taken custody of another so as to deprive him of his normal opportunities for protection. Restatement, supra, § 314A.
In Poole, the court found no duty on the part of an automobile driver to ensure that her blind, front-seat passenger utilized a seat belt. Id. at 85-87, 611 A.2d 169. In Praet v. Borough of Sayreville, 218 N.J.Super. 218, 527 A.2d 486 (App. Div.), certif. denied, 108 N.J. 681, 532 A.2d 253 (1987), the defendants were police officers who had "a pre-existing duty under the controlling circumstances to render emergency assistance" to a motorist trapped in a burning car. Id. at 223, 527 A.2d 486. There, we cited the Restatement, supra, §§ 321 to 324A, but only to emphasize that the common law generally "imposes no independent duty of rescue at all and relieves a bystander from any obligation to come forward." Id. at 224, 527 A.2d 486. That rule, however, does not relieve one who has a "contractual, relational, or transactional duty to render assistance." Ibid. As noted, the police in that case had, by virtue of their position, a "preexisting duty of rescue." Ibid. See Velazquez v. Jiminez, 172 N.J. 240, 262, 798 A.2d 51 (2002); Lundy v. Adamar of New Jersey, Inc., 34 F.3d 1173, 1178-81 (3d Cir.1994); Fuentes v. Reilly, 590 F.2d 509, 512-13 (3d Cir.1979).
Praet cannot be read as adopting §§ 321-22, 324 or 326 of the Restatement. When our courts have seen fit to incorporate Restatement principles into our common law, or to reject or modify them, the decisions have been clear to that effect. See, e.g., Butler v. Acme Mkts., Inc., 89 N.J. 270, 280, 445 A.2d 1141 (1982); Bauer v. 141-149 Cedar Lane Holding Co., 24 N.J. 139, 144-49, 130 A.2d 833 (1957).
In Endre v. Arnold, 300 N.J.Super. 136, 692 A.2d 97 (App.Div.1997), plaintiff's decedent, an alcoholic, was staying at the home of the defendant, a long-time friend. Id. at 139-40, 692 A.2d 97. Sometime during the night, the decedent apparently fell down the stairs. In the morning, the defendant saw him at the foot of the stairs but concluded he was "unconscious and in *159 no pain." Id. at 140, 692 A.2d 97. Later, she realized that he might be injured and, on decedent's instructions, called his son rather than an ambulance. After the son, an ambulance was eventually summoned, but decedent died of his injuries. Id. at 140-41, 692 A.2d 97. Plaintiff claimed the defendant had breached a duty to render assistance to decedent, her social guest. We stated:
The law as to the duty a host owes to a social guest who is at peril due to an injury sustained on the host's premises is not as well settled. We have not been able to unearth any reported decisional law in this state precisely on point. Nevertheless, we are satisfied that a host has a duty to come to the aid of a social guest who the host knows or has reason to know is in serious physical peril due to an accident that occurred on the host's premises. The duty, however, only requires the host to give such assistance as the host reasonably can and to take reasonable action to turn the injured person over to those qualified to care for the guest.
. . . .
More succinctly, "[t]he inquiry [as to whether a duty exists] involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution." Kelly, supra, 96 N.J. at 544 [476 A.2d 1219] (quoting Goldberg, supra, 38 N.J. at 583 [186 A.2d 291]). Employing that weighing process, we are satisfied that the common law, particularly in light of the special relationship between a host and a guest, imposes on a host a duty to come to the aid of a social guest who has seriously injured himself or herself on the host's premises even though the injury was sustained through no fault of the host.
[Id. at 143-44, 692 A.2d 97.]
Ultimately, we concluded that the defendant had no reason to know her guest had fallen and injured himself in the night, id. at 146, 692 A.2d 97, and that when she did learn of his condition early the next morning, any delay in summoning help could not be said to have been a substantial factor in bringing about the guest's death. Importantly, we never cited the Restatement in the course of our opinion, relying primarily on Prosser & Keeton on Torts (5th ed.1984).
Based on our review of these decisions, we conclude that New Jersey has never definitively adopted the common law principles embodied in the several Restatement provisions that formed the basis of the grand jury charge at issue here. Certainly our Supreme Court has not done so. While our dissenting colleague suggests otherwise, based on commendably exhaustive research, we remain unpersuaded that the duty as to which the grand jury was instructed here is so clearly embedded in our civil jurisprudence as to provide a foundation for criminal liability.

VI
It is fundamental that procedural due process requires notice and the opportunity to be heard. Avant v. Clifford, 67 N.J. 496, 520 n. 22, 341 A.2d 629 (1975). In Div. of Youth and Family Servs. v. A.R.G., 179 N.J. 264, 286, 845 A.2d 106 (2004), the Court recently reaffirmed that "[t]he basic indicia of due process are adequate notice and a meaningful opportunity to be heard." See also Borough of Keyport v. Maropakis, 332 N.J.Super. 210, 220-21, 753 A.2d 154 (App.Div.2000). Notice is the "first requirement of procedural due process." Avant, supra, 67 N.J. at 525, 341 A.2d 629. As applied to the criminal law, the principle requires that "[c]riminal statutes should be clear and understandable in order to achieve two goals: *160 notice of illegality and clear standards for enforcement." State v. Clarksburg Inn, 375 N.J.Super. 624, 632, 868 A.2d 1120 (App.Div.2005). Thus, the "vagueness doctrine sets forth the principle that `the law must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly."'" Id. at 633, 868 A.2d 1120 (quoting State v. Stafford, 365 N.J.Super. 6, 15, 837 A.2d 1118 (App.Div.2003) (quoting Grayned v. City of Rockford, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222, 227 (1972))). See also State v. Caez, 81 N.J.Super. 315, 319, 195 A.2d 496 (App. Div.1963).
It is a consequence of these rules that an indictment must be sufficiently clear to apprise a defendant of "that against which he must defend." State v. Spano, 128 N.J.Super. 90, 92, 319 A.2d 230 (App.Div.1973), aff'd, 64 N.J. 566, 319 A.2d 217 (1974); State v. Wein, 80 N.J. 491, 497, 404 A.2d 302 (1979). Yet, it is also settled that a defendant indicted for a particular offense is deemed to be on notice that the indictment may encompass a lesser-included offense, State v. Saulnier, 63 N.J. 199, 205-06, 306 A.2d 67 (1973); permit conviction as an accomplice even if the indictment alleges that defendant is a principal, State v. Mancine, 124 N.J. 232, 256-59, 590 A.2d 1107 (1991); or even, in some circumstances, allow conviction of an offense not charged at all. State v. Talley, 94 N.J. 385, 389-95, 466 A.2d 78 (1983) (defendant charged with robbery could be convicted of theft by deception in light of consolidation of theft offenses and defendant's own testimony). See also State v. Branch, 155 N.J. 317, 324-25, 714 A.2d 918 (1998).
Against this background, we conclude that N.J.S.A. 2C:2-1b(2), to the extent that it seeks to incorporate principles derived from civil common law, does not provide sufficient notice to satisfy prevailing standards of constitutionally adequate procedural due process. Our conclusion is buttressed by the fact that the purported common law duty incorporated into the reckless manslaughter charge was based upon provisions of the Restatement that have never, as we have noted, been unequivocally adopted in our State. In any event, even if we were to agree with the dissent that a basis for these principles may be gleaned from our civil common law, the question remains whether those civil duties may be imported into the criminal law.
It is a maxim that ignorance of the law is no defense. State v. Western Union Tel. Co., 12 N.J. 468, 493-94, 97 A.2d 480, appeal dismissed, 346 U.S. 869, 74 S.Ct. 124, 98 L.Ed. 379 (1953); see also In the Matter of Two Seized Firearms, 127 N.J. 84, 88, 602 A.2d 728 (1992). That precept reflects the legal fiction that all persons are presumed to know the law. See generally, Lon L. Fuller, Legal Fictions (1967). But it stretches that fiction too far to put a defendant on notice that the prohibition against his conduct is to be found in emanations from a scholarly treatise that has never made its way into New Jersey substantive criminal law, and perhaps not into our civil law either. We fail to see how these civil common law principles could provide adequate notice to justify a criminal charge. A duty of care, upon which a duty to act is premised, must be so firmly established as to be beyond controversy or dispute if it is to provide presumed notice. In this case, the duty charged to the grand jury was based on amorphous concepts of the Restatement, as reflected in some civil cases, and thereby failed the fundamental test of due process notice. As his attorney argued, defendant could not have fairly "been on notice that that was the law on *161 that evening."[2] It is not sufficient that defendant might be held civilly accountable for A.R.'s death. It is his criminal responsibility that is at issue and different rules guide that determination.
We may all agree that defendant's actions, if true, were contemptible. But a general sense of outrage, that the defendant violated "the code of moral conduct," Szabo v. Pennsylvania R.R. Co., 132 N.J.L. 331, 333, 40 A.2d 562 (E. & A.1945), cannot substitute for adequate notice that the conduct may have penal consequences. We cannot equate "immorality with criminality." State v. Cohen, 32 N.J. 1, 11, 158 A.2d 497 (1960) (Weintraub, C.J., concurring).
In light of our disposition we need not address defendant's alternative argument, adopted by the motion judge, that the grand jury charge improperly incorporated a negligence standard.
While we do not lightly set aside an indictment, State v. Morrison, 188 N.J. 2, 12-13, 902 A.2d 860 (2006), and while "mere incomplete or imprecise legal interpretations will not warrant dismissal of the indictment," State v. Laws, 262 N.J.Super. 551, 563, 621 A.2d 526 (App.Div.1993), a patently "incorrect statement of the law," State v. Ball, 268 N.J.Super. 72, 120, 632 A.2d 1222 (App.Div.1993), aff'd, 141 N.J. 142, 661 A.2d 251 (1995), does impair the integrity of the proceedings to such an extent that dismissal is required. Here, the prosecutor could have given the grand jury a very general instruction on reckless manslaughter, and "hoped for the best." However, and quite commendably, he placed before the grand jury his theory as to defendant's duty, which would, we assume, be the same legal position adopted at trial.[3] Having done so, we are unable to see how the grand jury could not, in these circumstances, have been substantially motivated to return the indictment based on these instructions, which we have concluded were erroneous. It is no answer to say that the evidence before the grand jury was sufficient to support an indictment on some other theory.
Of course, the State is free to re-present the manslaughter charge to the grand jury without reference to the Restatement principles we have discussed. Thus, the State could argue, for example, as it did in the motion court, that defendant's actions were "as much conduct as [they were] an omission," a view seemingly endorsed by the dissent. We express no view on whether any such indictment would be legally or factually sustainable.
Affirmed.
LIHOTZ, J.T.C. (temporarily assigned), concurring in part and dissenting in part.
I am in accord with the majority's legal reasoning and conclusion rejecting the trial court's determination that the 1997 amendment to N.J.S.A. 2C:2-1b eliminated civil, common law principles as a source of defining when a duty to act arises, the failure of which may result in criminal liability. I also agree that the purpose of the amendment was to enhance the omissions covered to now include statutorily defined duties "intended to protect the public safety or any rule or regulation promulgated thereunder," ibid., in addition to those *162 originally intended by the Code prior to the amendment.
However, I part company with the majority's determination to dismiss the second-degree reckless manslaughter indictment and its reasoning that the charge relied on the definition of duty as recited in various sections of the Restatement (Second) Torts (1965), which have never been definitively adopted by our courts. While the majority correctly notes there is no reported New Jersey case "address[ing] the propriety of using the Restatement as a source of defining legal duty underpinning a manslaughter charge," I cannot accede to its narrowly-tailored interpretation that the statute's incorporation of common law, renders N.J.S.A. 2C:2-1b so constitutionally vague that it fails to sufficiently apprise defendant of "that against which he must defend." State v. Spano, 128 N.J.Super. 90, 92, 319 A.2d 230 (App.Div.1973), aff'd, 64 N.J. 566, 319 A.2d 217 (1974); State v. Wein, 80 N.J. 491, 497, 404 A.2d 302 (1979).
I also disagree with the majority's conclusion that the indictment for reckless manslaughter is based solely on an omission. The question of whether defendant owed a duty to A.R. is intertwined with the issue of causation, requiring an analysis of defendant's actions as well as his omissions. Defendant's failure to provide emergency medical care for A.R. was the last event in a course of conduct that must be viewed in its entirety when examining whether a duty existed and whether the indictment should stand.
The majority's conclusion focuses on the Restatement, stating: "New Jersey has never definitively adopted the[] common law principles embodied in the several Restatement provisions that formed the basis of the grand jury charge." This ignores our State's acceptance that the legal concept of duty is based on the underlying common law principles that form the "natural responsibilities of social living and human relations" recognized by reasonable men, Wytupeck v. Camden, 25 N.J. 450, 462, 136 A.2d 887 (1957), which are also reflected in the Restatement. Contrary to the majority's inference, the State did not recite its specific reliance on the Restatement to define when a duty arises. Rather, the charge to the grand jury presented principles of law expressed in past court decisions that are also reflected in the Restatement. This distinction is important because it is the common law, as reinforced by our court decisions, that provides sufficient notice to a defendant that a failure to act may be culpable when defining the limits of omission liability. Thus, if a person has a duty to prevent a harm but fails to do so, he or she shall be punished the same as one who affirmatively acts to cause such harm.
The imposition of criminal liability for the failure to act to perform a duty "imposed by law," N.J.S.A. 2C:2-1b, without question includes a duty arising from civil common law. II The New Jersey Penal Code, Final Report of the New Jersey Criminal Law Revision Commission 39 (1971). A pre-Code example where the "mere act of omission" had been held to be "so criminal or culpable as to be the subject of an indictment for manslaughter" based upon common law is found in State v. O'Brien, 32 N.J.L. 169, 171-72 (N.J.Sup. Ct.1867). There, the defendant, a railway switch operator, negligently failed to adjust the switch, causing a passenger train to a side rail off the track, resulting in one passenger's death. Ibid. The defendant was indicted and convicted on manslaughter, based on his omission, or the failure to perform his duty of adjusting the switch. On appeal, the defendant's conviction was affirmed. The adoption of our Penal Code *163 incorporates such common law legal duty concepts so that the existence of a legal duty accompanied by the knowledge of facts requiring the need to avert further harm imposes criminal liability for failing to act.
The question of whether a duty exists has been largely a question of fairness. Kelly v. Gwinnell, 96 N.J. 538, 544, 476 A.2d 1219 (1984). "The inquiry involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution." Goldberg v. Housing Authority of Newark, 38 N.J. 578, 583, 186 A.2d 291 (1962); see also Wang v. Allstate Ins. Co., 125 N.J. 2, 15, 592 A.2d 527 (1991); Lombardo v. Hoag, 269 N.J.Super. 36, 48-49, 634 A.2d 550 (App.Div.1993). In Wytupeck, supra, 25 N.J. at 461, 136 A.2d 887, the Supreme Court discussed duty, stating:
"Duty" is not an abstract conception; and the standard of conduct is not an absolute. Duty arises out of a relation between the particular parties that in right reason and essential justice enjoins the protection of the one by the other against what the law by common consent deems an unreasonable risk of harm, such as is reasonably foreseeable.
[Ibid. (citations omitted).]
The Supreme Court has also quoted Heaven v. Pender, 11 Q.B. 503, 509 (1883), when describing the general common law duty of care resulting in tort liability for its breach:
"Whenever one person is placed by circumstances in such a position with regard to another that every one of ordinary sense who did think would at once recognize that if he did not use ordinary care and skill in his own conduct with regard to those circumstances he would cause danger of injury to the person or property of the other, a duty arises to use ordinary care and skill to avoid such danger."
[Collopy v. Newark Eye & Ear Infirmary, 27 N.J. 29, 32, 141 A.2d 276 (1958) (quoting Heaven, supra, 11 Q.B. at 509).]
As the prosecutor correctly explained to the grand jury, "one has no legal duty to aid another person in peril, even when that aid can be rendered without danger or inconvenience to himself." See Velazquez v. Jiminez, 172 N.J. 240, 262-63, 798 A.2d 51 (2002); Endre v. Arnold, 300 N.J.Super. 136, 145, 692 A.2d 97 (App.Div.) certif. denied, 150 N.J. 27, 695 A.2d 670 (1997); Praet v. Borough of Sayreville, 218 N.J.Super. 218, 224, 527 A.2d 486 (App.Div.) certif. denied, 108 N.J. 681, 532 A.2d 253 (1987); see also Lundy v. Adamar of N.J., 34 F.3d 1173, 1178-79 (3d Cir.1994). The rule, however, is not without exception and liability rests on those who, at the time of their omission, were under a "legal duty" to act. Oftentimes, such exceptions creating enforceable duties are aimed at preserving life.
Liability for non-action has been extended when the parties have a "special relationship," Poole v. Janeski, 259 N.J.Super. 83, 84, 611 A.2d 169 (Law Div.1992). The duty to render assistance results from "relationships characterized as contractual, relational, or transactional." Praet, supra, 218 N.J.Super. at 224, 527 A.2d 486 (citing §§ 321 to 324A of Restatement); see Endre, supra, 300 N.J.Super. at 143, 692 A.2d 97 (citing § 314A of Restatement); Poole, supra, 259 N.J.Super. at 84, 611 A.2d 169 (Good Samaritan Act does not confer immunity on one who has a preexisting duty to render emergency assistance, citing §§ 314 and 320 of Restatement); Szabo v. Pennsylvania R.R. Co., 132 N.J.L. 331, 333, 40 A.2d 562 (1945) (imposing duty on employer to render medical aid when employee becomes ill on the job); see also *164 Lundy, supra 34 F.3d at 1178-79 (casino owes duty to secure medical aid to patron sustaining injury rendering him helpless to provide for his own care).
Endre v. Arnold resolved the question of the legal duty of a social host to exercise reasonable care to render aid to an injured guest. 300 N.J.Super. at 143-45, 692 A.2d 97. In Endre, the decedent fell down a flight of stairs, in the defendant's home, while intoxicated. Id. at 140-41, 692 A.2d 97. Employing the "weighing process" recited in Goldberg, we stated that "the common law, particularly in light of the special relationship between a host and a guest, imposes on a host a duty to come to the aid of a social guest who has seriously injured himself or herself on the host's premises even though the injury was sustained through no fault of the host." Id. at 144, 692 A.2d 97. We determined further that the duty is "circumscribed," requiring "nothing more than reasonable care under the circumstances." Id. at 146, 692 A.2d 97. Our ruling, finding no liability on the part of the defendant, turned on the failure to establish proximate cause, a problem not presented in the case at bar.
Here, the facts demonstrate a social guest/host relationship; A.R. and others gathered in defendant's basement where they "drank beer and played guitar." Defendant and A.R. knew each other and, in the past, had been intimate. Defendant was aware that A.R. was a minor and she had purchased drugs from him on prior occasions. Finally, defendant escorted A.R. from the basement, upstairs to his bedroom, separating her from her other companions. A.R. became unconscious and in need of medical attention as a result of a drug used while alone with defendant. Defendant's duty to assist A.R. was triggered once A.R. lapsed into unconsciousness. The exigencies of the situation presented called for medical attention at the earliest possible moment, action which I suggest would have been "reasonable under the circumstances." Ibid.
Next, the grand jury charge addressed liability imposed upon one who voluntarily assumes care of another and then fails to act. The charge to the grand jury stated:
A person has a duty to act where he has voluntarily assumed the care of another and so secluded the helpless person as to prevent others from rendering aid. A duty to act may be triggered where the defendant makes statements or engages in conduct that prevents another person from seeking aid to the victim.
Flowing from the common law concept that one who voluntarily undertakes an obligation to perform emergency assistance may be liable for failure to do so, see Praet, supra, 218 N.J.Super. at 224, 527 A.2d 486, this section of the charge is aimed at action, not merely omission. Section 314A(4) of the Restatement recites this duty as we noted in Anslinger v. Martinsville Inn, Inc., 121 N.J.Super. 525, 535-36, 298 A.2d 84 (App.Div.1972), cert. denied, 62 N.J. 334, 301 A.2d 449 (1973) (liability determination turned on finding that defendants' were not volunteers responsible for intoxicated colleague). See also McIntosh v. Milano, 168 N.J.Super. 466, 483-84, 403 A.2d 500 (Law Div.1979); Poole, supra, 259 N.J.Super. at 84, 611 A.2d 169. The duty to rescue arises when the actor assumes total control of the victim who is rendered helpless by the actor's conduct or when the victim is in the rescuer's sole custody without access to alternative rescuers. See Fuentes v. Reilly 590 F.2d 509, 513 (3d Cir.1979) (concluding New Jersey would impose civil duty on truck driver to summon medical aid for injured motorcyclist who collided with truck; citing § 322 of Restatement); see also Cooper v. Hutchinson, 184 F.2d 119, 123 (3d Cir.1950) ("rights may be acquired *165 by one from action by another, even though that action could not be legally demanded[,]" citing §§ 323-325 of Restatement).
The relationship between the parties, coupled with the actor's control of the helpless victim, has resulted in a finding of a duty to act in several cases. See J.S. v. R.T.H., 155 N.J. 330, 338-39, 714 A.2d 924 (1998) (wife has legal duty to warn children of husband's potential for sexual abuse); Duda v. Gaines, 12 N.J.Super. 326, 328, 79 A.2d 695 (App.Div.1951) (teacher/coach had duty to render medical aid to ill student/athlete); Szabo, supra, 132 N.J.L. at 333, 40 A.2d 562 (employer has duty to render medical aid to sick or injured employee); see also Lundy, supra, 34 F.3d at 1178-79 (casino has duty to summon medical aid to patron suffering heart attack).
Overall, I believe these principles are firmly rooted in our civil law and see no due process barrier in adopting such long-standing principles to define a legal duty in the context of prescribing the limits of criminal liability for failure to act.
The final portion of the grand jury charge relates to the question of causation; that is, the precipitating factor in causing A.R.'s death was the lack of immediate, necessary medical aid when she lapsed into unconsciousness after ingesting additional methadone. Duty is defined by the causal relationship between defendant's failure to act and harm suffered. The prosecutor stated:
A person has the duty to act when the person is responsible for placing the victim in the position of danger or peril. If the person knows or has reason to know that[,] by his conduct[,] he has caused bodily harm to another[,] as to make her helpless and endanger or further harm, the person is under a duty to exercise reasonable care to prevent such further harm.
Application leads to the conclusion that when the failure to act is inconsistent with the common expectation that one would act to prevent an unreasonable risk of harm he created and, but for that omission, the harm would not have resulted, a legal duty to act was triggered. See Wytupeck, supra, 25 N.J. 450, 461, 136 A.2d 887.
Equally important, in this case, is the fact that defendant is not an innocent bystander, but an active participant. Defendant knew the risk of harm facing A.R. because defendant had previously explained to Smith, defendant's methadone supplier, that the drug was addictive and should not be taken with alcohol. Defendant sold A.R. methadone tablets and supplied her beer. Defendant then escorted A.R., whose pupils were almost fully dilated, to his bedroom where additional drugs were consumed, after which A.R. became unconscious and was slumped-over on defendant's bed. Defendant locked the bedroom and basement doors to prevent intrusion by others, and defendant did not respond to the request of others to speak with A.R. Defendant continued A.R.'s isolation from her companions when she was helpless and in need of aid. These affirmative actions must be viewed in context with the omission to provide A.R. medical attention. The medical examiner concluded that A.R.'s chance of survival would have increased had medical attention been summoned when A.R. first lost consciousness between 4:30 a.m. and 5:00 a.m. Defendant believed the methadone was the cause of A.R.'s inability to breathe, but nevertheless actively resisted summoning 911 for over twelve hours.
Viewing the evidence and the rational inferences drawn from that evidence in the light most favorable to the State, the grand jury could reasonably believe that a *166 crime occurred and that the defendant committed it. See State v. Reyes, 50 N.J. 454, 459, 236 A.2d 385 (1967). The indictment should not be disturbed as it is not manifestly deficient or palpably defective. State v. Morrison, 188 N.J. 2, 12-13, 902 A.2d 860 (2006); see also State v. Laws, 262 N.J.Super. 551, 562-63, 621 A.2d 526 (App.Div.), certif. denied, 134 N.J. 475, 634 A.2d 523 (1993).
Accordingly, while concurring with some of the premises informing the majority's approach, I respectfully dissent from the conclusion it has reached.
NOTES
[1] One of A.R.'s friends testified that she knew A.R. was menstruating on the night in question. She claimed that, knowing A.R., she did not believe A.R. would engage in consensual sex while menstruating.
[2] As counsel also argued, if the State's position were accepted, at trial the judge would "have to give all the defense instructions that emanate out of the Restatement of Torts Second to this jury and tell them that it is the criminal law of the State of New Jersey."
[3] The prosecutor adopted a sound course by submitting his theory to be tested at the indictment stage, rather than waiting until trial and, if there were a conviction, an eventual appeal.