**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3813-17T4

ASCENTIUM CAPITAL LLC,

     Plaintiff-Respondent,

v.

A&A MANAGEMENT SYSTEMS
LIMITED LIABILITY COMPANY,
and ALI R. MAZANDARANI,

     Defendants/Third-Party
     Plaintiffs-Appellants,

and

HELIOS ENERGY GROUP LLC,
and JARED KUNISH,

     Third-Party Defendants.

_____

Argued May 21, 2019 – Decided October 28, 2019

Before Judges Rothstadt and Gilson.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-1419-16.

Vafa Sarmasti argued the cause for appellants (Sarmasti PLLC, attorneys; Vafa Sarmasti, on the briefs).

Robert L. Hornby argued the cause for respondent (Chiesa Shahinian & Giantomasi PC, attorneys; Robert L. Hornby and Ryan Patrick O'Connor, on the brief).

The opinion of the court was delivered by

ROTHSTADT, J.A.D.

Defendants A&A Management Systems (AMS) and its principal, Ali R. Mazandarani, appeal from the Law Division's January 23, 2018 order granting plaintiff Ascentium Capital LLC summary judgment and from a March 16, 2018 order denying reconsideration. The parties' dispute arose from agreements under which plaintiff financed AMS's purchase of a co-generation system from third-party defendant, Helios Energy Group, LLC (Helios), through its salesperson, third-party defendant, Jared Kunish. Helios delivered the equipment for the system but never had it installed.[1]

In moving for summary judgment, plaintiff relied on a "hell or high water" clause contained in paragraph four of each of the parties' financing

---

[1] On March 30, 2018, Helios and Kunish were dismissed from the action without prejudice due to lack of prosecution under Rule 1:13-7.

agreements. It stated in bold and conspicuous lettering: "YOUR OBLIGATION TO MAKE PAYMENTS AND PAY OTHER AMOUNTS DUE HEREUNDER IS ABSOLUTE AND UNCONDITIONAL AND NOT SUBJECT TO ABATEMENT, REDUCTION OR SET-OFF FOR ANY REASON WHATSOEVER. THIS IS A NON-CANCELABLE AGREEMENT."

In opposition, defendants asserted that that clause did not bar their claims because Kunish and Helios acted as plaintiff's agent and they fraudulently failed to install the equipment. Moreover, defendants averred that despite that provision, they should have been relieved of any obligation to pay plaintiff because plaintiff imperfectly executed its internal policies to safeguard against vendor fraud.

In awarding summary judgment to plaintiff, the motion judge rejected defendants' contentions and enforced the "hell or high water" clause, entered judgment in plaintiff's favor, and awarded attorneys' fees. On appeal, defendants contend that the motion judge did not correctly apply the summary judgment standard, failed to recognize that plaintiff breached its "duty to protect [its] borrowers from vendor fraud," improperly dismissed their counterclaim for damages under the New Jersey Consumer Fraud Act (CFA),

N.J.S.A. 56:8-1 to -211, and awarded damages and attorneys' fees that were excessive.

Having considered defendants' arguments in light of the record and the applicable law, we affirm the two orders under appeal as we conclude defendants' contentions are without merit, except as to the motion judge's award of attorneys' fees that we now vacate and remand for reconsideration.

I.

The pertinent facts and the parties' factual contentions taken from the motion record, are viewed in a light most favorable to defendant, W.J.A. v. D.A., 210 N.J. 229, 237 (2012), and are summarized as follows. Plaintiff was in the nationwide business of financing companies' purchases or leasing of equipment. As part of the total amount that plaintiff provided to its customers, plaintiff financed up to forty percent for soft costs, such as installation and consulting fees. Helios was in the business of selling energy systems and related equipment to its customers so they could generate their own energy and not be dependent upon public utilities.

A few months before Kunish sold a co-generation system to AMS, Helios established a relationship with plaintiff. Under plaintiff's internal ranking system, it approved Helios as a "Tier 3" vendor. As a "Tier 3" vendor,

in any transaction involving a Helios customer, plaintiff would not release funds to Helios until the equipment was on site and the customer notified plaintiff that the funding could be released. According to John Scott Linton, plaintiff's Vice President of Sales, although it was not unusual for some vendors to act as if plaintiff was the vendor's financing arm, plaintiff had no control over those representations being made.

Kunish first approached Mazandarani in 2014 and proposed that Helios install a solar co-generation system for AMS. Kunish represented that AMS could lease the system for a period of five years through Helios's in-house leasing company, and that once the lease payments concluded, AMS would only be responsible for monthly energy costs. Kunish also told AMS that lease payments would not begin until the system was installed and operational.

Mazandarani agreed to Kunish's proposal and completed Helios's "Commercial Credit Application" on behalf of AMS, as well as plaintiff's "Commercial Credit Application." One week later, Mazandarani learned that Helios and plaintiff had approved AMS's applications.

On October 1, 2014, "Kunish and [plaintiff] presented AMS with" documents on plaintiff's letterhead for AMS's signature, which plaintiff required relative to AMS's leasing of the equipment being supplied by Helios.

5

These documents consisted of an "Authorization to Perform Verbal Verification," an "Equipment Finance Agreement No. 2141980" (Agreement #1), an "Authorization for Pre-Authorized Payments," and a "Delivery and Acceptance Certificate." Mazandarani signed Agreement #1, the "Authorization for Pre-Authorized Payments," and the "Delivery and Acceptance Certificate," and he executed a personal guaranty of Agreement #1. The next day, AMS paid an initial payment of $2130.86 to plaintiff. Plaintiff later secured repayment by filing a UCC-1 financing statement, establishing a lien on the leased equipment.

According to Mazandarani, when he signed Agreement #1 there was no "Schedule A" attached to it describing the equipment, despite the reference to the schedule in the upper-right corner of the agreement. "Schedule A" was to be a copy of Helios's invoice, breaking down the prices for the equipment, LED lighting, a ten-year maintenance contract, labor for installation, and a fee for project management and consulting, which totaled $46,169.00. According to Linton, plaintiff typically did not provide customers with the vendor's invoice from the "Schedule A" information, as it was up to the vendor to provide that information to its customer. Before signing the agreement, Mazandarani did not ask plaintiff or Kunish for the "Schedule A" information.

A-3813-17T4

On October 3, 2014, plaintiff's representative called Mazandarani to verify that the system had been "delivered and installed." During the conversation, plaintiff's representative asked if AMS had "received everything yet." Mazandarani answered "[y]eah," and authorized plaintiff to "release payment to the vendor and start [AMS's] agreement." Plaintiff then "paid the entire amount" owed by AMS to Helios and commenced its electronic withdrawal of monthly lease payments from AMS's account, as previously authorized by Mazandarani. However, unbeknownst to plaintiff, although AMS received all of the equipment from Helios, the system had not been installed.

In March 2015, Kunish informed Mazandarani that the cost of the project and equipment went over budget and that additional funds had to be secured, which would increase AMS's lease payments. Plaintiff provided the additional funds pursuant to a new set of agreements that Mazandarani signed. The second set of documents included plaintiff's form "Equipment Finance Agreement No. 2152350" (Agreement #2) that also referenced a "Schedule A," which Mazandarani claimed was not attached at the time of signing. They also included plaintiff's "Authorization for Pre-Authorized Payments" form and

7

"Delivery and Acceptance Certificate." In addition, Mazandarani signed a personal guaranty of Agreement #2.

The "Schedule A," which was intended to accompany Agreement #2 listed miscellaneous equipment, including a generator, two heat exchangers, a UPS battery, backup systems, and installation costs, totaling $8400.00. In connection with Agreement #2, AMS paid an initial payment of $567.20. Plaintiff filed another UCC-1 financing statement concerning the equipment listed in Agreement #2. However, Mazandarani claims AMS never received the equipment listed.

On March 26, 2015, plaintiff's representative called Mazandarani to verify that the equipment subject to Agreement #2 had been "delivered and installed," and to obtain his authorization for the release of funding to Helios. On that call, Mazandarani confirmed that he had "received everything from the vendor" and that "everything . . . is completed." Plaintiff's representative then asked Mazandarani if he knew "the completion date," to which Mazandarani responded, "in a few days, hopefully." The representative evidently misheard him and asked, "[y]ou said a few days ago?" Mazandarani responded affirmatively. Based on that authorization, plaintiff commenced withdrawals from the AMS account, as provided for in the signed documents.

In October 2015, although Helios had still not completed installation of the co-generation system, Mazandarani realized that plaintiff had been withdrawing lease payments from an AMS bank account that he claimed was not monitored regularly. AMS stopped the withdrawals and "demanded the return of the money" taken based on its understanding that the lease payments were not to begin until the system was operational.

After Mazandarani stopped plaintiff's automatic withdrawals, AMS ceased making payments and plaintiff declared AMS to be in default under the two agreements. Plaintiff demanded possession of its collateral but AMS refused to relinquish it to plaintiff.[2] Plaintiff then demanded "the accelerated balance, plus interest, expenses and late charges" under Agreement #1 for a total of $43,942.07, and "the accelerated balance, plus interest, expenses and late charges" under Agreement #2 for a total of $9246.93.[3] Defendants did not make any payments in response to plaintiff's demands.

---

[2] Although AMS later offered to relinquish the equipment, plaintiff was not seeking recovery of the equipment because it believed it had no value.

[3] Due to AMS's default and the default of AMS's neighbor on a similar transaction involving Helios, plaintiff terminated its relationship with Helios.

Plaintiff filed its complaint in 2016 seeking compensatory damages in the amount of $53,189.00, title and possession of the equipment, and attorneys' fees and costs. AMS and Mazandarani filed an answer, counterclaim, and a third-party complaint against Helios and Kunish, sought a declaration that the two agreements with plaintiff were "void and/or unenforceable," and demanded damages under the CFA, and for conversion, unjust enrichment, and negligence. Plaintiff filed an answer to the counterclaims and a week later filed a notice of motion for summary judgment. A Law Division judge denied the motion on September 30, 2016, because it was premature as discovery had not been commenced.

After completion of discovery, plaintiff filed a second motion for summary judgment on November 16, 2017. Oral argument was held on January 11, 2018, before a different judge.

In support of its motion, plaintiff argued that defendants were parties to a fully integrated agreement that plaintiff had performed under the agreement by providing the funding to Helios, and therefore, plaintiff was entitled to summary judgment for defendants' default and breach of the contract. Plaintiff also argued that the absence of "Schedule A" when Mazandarani signed the agreements was not material, as the agreements were loans and the amounts

due on the loans were listed on the face of the documents. Plaintiff asserted that it was entitled to counsel fees under paragraph nine of both agreements and its attorneys included copies of their bills to plaintiff in support of its application for an award of fees and costs.

Defendants argued that the "hell or high water" clauses in the agreements could not constitute an absolute defense to fraud in the inducement, and that plaintiff acquiesced to Helios's and Kunish's representations that plaintiff was a part of Helios. Defendants contended that "soft costs" should not be awarded because plaintiff's internal policy disallowed it. Defendants also argued that plaintiff's failure to include "Schedule A" in either of the agreements constituted fraud. Defendants did not raise any objection to plaintiff's application for counsel fees.

In his January 23, 2018 order, the motion judge granted summary judgment in favor of plaintiff and awarded counsel fees. Attached to the order was a rider with eleven bullet points explaining why he granted plaintiff the relief it was seeking. Among the reasons stated were that defendants presented no evidence that there was "any relationship between Kunish [or] Helios and [p]laintiff," that the two agreements specifically disclaimed any principal-agent relationship between plaintiff and any other party, defendants and

11

plaintiff never had any direct interactions, and any fraud or misrepresentation was attributable solely to Kunish or Helios.

The motion judge also found that defendants had knowledge of "what equipment [they were] to receive," as a result of their "communications with Kunish leading up to [the a]greements" and that the absence of "Schedule A" was not material. He also found that AMS "ratified the [a]greements" by allowing monthly payments to be withdrawn from its bank account. The judge ruled that the "hell or high water" clauses were enforceable, regardless of whether the agreements were characterized as leases or loans. He also found that plaintiff had "no legal obligation" to protect defendants from fraud irrespective of their internal "fraud prevention guidelines." Finally, the judge awarded plaintiff attorneys' fees as provided for in the two agreements.

Defendants filed a motion for reconsideration on February 12, 2018. The judge denied the motion on March 16, 2018, after concluding defendants "raise[d] issues already argued" and that the parties' agreements did not limit defendants' obligation to only include "the 'hard' elements of the transaction." This appeal followed.

## II.

We review a grant of summary judgment de novo, using the same standard that governed the motion court's decision. RSI Bank v. Providence Mut. Fire Ins. Co., 234 N.J. 459, 472 (2018); see also Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 405 (2014). Under that standard, summary judgment will be granted when "the competent evidential materials submitted by the parties," viewed "in the light most favorable to" the non-moving party, show that there are no "genuine issues of material fact" and that "the moving party is entitled to summary judgment as a matter of law." Grande v. Saint Clare's Health Sys., 230 N.J. 1, 23-24 (2017) (quoting Bhagat v. Bhagat, 217 N.J. 22, 38 (2014)); accord R. 4:46-2(c). "An issue of material fact is 'genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact.'" Grande, 230 N.J. at 24 (quoting Bhagat, 217 N.J. at 38). We owe "no special deference" to the motion court's legal analysis or its interpretation of a statute. RSI Bank, 234 N.J. at 472; see also Hitesman v. Bridgeway, Inc., 218 N.J. 8, 26 (2014).

## III.

We begin our de novo review by considering defendants' contention that the motion judge's limited findings of fact and conclusions of law—his eleven bullet points—demonstrated that he applied the wrong standard by not drawing all legitimate inferences in favor of defendants as the non-moving parties. We agree that the motion judge's statement of reasons is an imperfect example of what is required under Rule 1:7-4 because "[n]aked conclusions do not satisfy the purpose of [the Rule]. Rather, the trial court must state clearly its factual findings and correlate them with the relevant legal conclusions." Curtis v. Finneran, 83 N.J. 563, 570 (1980), see also Gnall v. Gnall, 222 N.J. 414, 428 (2015). However, because appeals are taken from judgments and not "reasons given for the ultimate conclusion," Do-Wop Corp. v. City of Rahway, 168 N.J. 191, 199 (2001), and because our review is de novo, we are not persuaded that either a remand or reversal is warranted. Ellison v. Evergreen Cemetery, 266 N.J. Super. 74, 78 (App. Div. 1993) ("[A]n order or judgment will be affirmed on appeal if it is correct, even though the judge gave the wrong reasons for it."). Although we reach the same conclusion as the motion judge in response to plaintiff's motion, except as to an award of counsel fees and costs, we do so for the reasons expressed below.

A-3813-17T4

## A.

We turn first to defendants' contention that the motion judge incorrectly determined in his first three bullet points that there was no agency relationship between plaintiff and Kunish or Helios, despite the plain language of the two agreements. Moreover, defendants state that if there was no agency relationship, the judge incorrectly concluded that plaintiff was entitled to payment as it allowed Kunish and Helios to hold themselves out as plaintiff's partner. According to defendants, plaintiff should have been estopped from denying this relationship and from recovering against defendants. We find no merit to these arguments.

Agency that is not express or implied can be established through evidence of "apparent authority" to act on behalf of another. See Sears Mortg. Corp. v. Rose, 134 N.J. 326, 343-44 (1993). However, it only "arises when a principal 'acts in such a manner as to convey the impression to a third party that the agent has certain power which he may or not possess.'" Lobiondo v. O'Callaghan, 357 N.J. Super 488, 497 (App. Div. 2003) (quoting Rodriguez v. Hudson Cty. Collision Co., 296 N.J. Super. 212, 220 (App. Div. 1997)). "Liability will be imposed upon the principal . . . where the actions of a principal have misled a third party into believing that a relationship of

15

authority existed." Ibid. (emphasis added) (quoting Rodriguez, 296 N.J. Super. at 221).

The question is "whether the principal has by [its] voluntary act placed the agent in such a situation that a person of ordinary prudence, conversant with business usages and the nature of the particular business, is justified in presuming that such agent has authority to perform the particular act in question . . . ." Ibid. (quoting Legge, Indus. v. Kushner Hebrew Acad., 333 N.J. Super. 537, 560 (App. Div. 2000)). "[A] court must examine the totality of the circumstances to determine whether an agency relationship existed even though the principal did not have direct control over the agent." AMB Prop., LP v. Penn Am. Ins. Co., 418 N.J. Super. 441, 454 (App. Div. 2011) (quoting Sears Mortg. Corp, 134 N.J. at 338).

A party relying on the apparent authority of an agent must establish:

> (1) that the appearance of authority has been created by the conduct of the alleged principal and it cannot be established alone and solely by proof of [conduct by] the supposed agent; (2) that a third-party has relied on the agent's apparent authority to act for a principal; and (3) that the reliance was reasonable under the circumstances.
>
> [Ibid. (alteration in original) (quoting Mercer v. Weyerhaeuser Co., 324 N.J. Super. 290, 318 (App. Div. 1999)).]

A-3813-17T4

In this case, defendants failed to establish the first factor because they did not identify any voluntary conduct by plaintiff that would have given the impression that Kunish or Helios was acting on its behalf. Although plaintiff was aware that some vendors chose to present plaintiff as their "financing arm," there was no evidence that plaintiff had any control over this behavior. Additionally, the representations were belied by all documents provided to defendants that identified plaintiff as a separate entity, including the two agreements that clearly stated in paragraph five in bold and conspicuous lettering: "NEITHER THE SUPPLIER NOR ANY OTHER PARTY IS SECURED PARTY'S AGENT." For that reason, defendants also cannot establish the third factor that their belief Kunish or Helios acted on behalf of plaintiff was reasonable.[4]

Defendants' unreasonable belief that there was an agency relationship also defeats their claim that plaintiff should be estopped from denying that Kunish or Helios was its agent. Agency by estoppel, as argued by defendants, is different than apparent authority. <u>See</u> <u>Estate of Cordero ex rel. Cordero v.</u>

---

[4] Defendants' reliance on a no-longer-extant Helios website, which listed plaintiff as an "Investment Partner," is unavailing. The website also listed as investment partners, other well-known financial companies such as Goldman Sachs and Morgan Stanley. It would be unreasonable for defendants to believe that those companies were also part of the "financing arm" of Helios.

A-3813-17T4

Christ Hosp., 403 N.J. Super. 306, 315 n.3 (App. Div. 2008). See also Atl. Guar. & Title Ins. Co. v. McDevitt, 105 N.J. Eq. 570, 571-72 (Ch. 1930) (holding that "where one of two innocent [parties] must suffer" from fraud of a third-party, loss should be sustained by the one whose conduct made the fraud possible). Under the theory of estoppel, an otherwise innocent party can be held liable for another's actions if the injured party "make[s] a detrimental change in position because the transaction is believed to be on the person's account." Restatement (Third) of Agency § 2.05 (Am. Law. Inst. 2006). Liability will be imposed only "if (1) the [otherwise innocent] person intentionally or carelessly caused such belief, or (2) having notice of such belief and that it might induce others to change their positions, the person did not take reasonable steps to notify them of the facts." Ibid.

The doctrine applies "when the person against whom estoppel is asserted has made no manifestation that an actor has authority as an agent," usually due to a "failure to use reasonable care, either to prevent circumstances that foreseeably led to the belief, or to correct the belief once on notice of it." Id. at cmt. c. "The principal's failure to use care enables the agent, or an actor who purports to be an agent, to misrepresent the agent's authority or to

masquerade as an agent." Id. at cmt. d. "If the third party's [belief] is unreasonable," however, that "party should not recover." Ibid.

Applying that doctrine here, while plaintiff was aware that some vendors made representations similar to defendants and did not attempt to prevent such behavior, for the reason already discussed, it was not reasonable for defendants to rely upon any representation made by Kunish or Helios that contradicted the documents that defendants signed and delivered to plaintiff.

### B.

Next, we address defendants' challenge to the motion judge's finding in his fifth bullet point that AMS was aware of the equipment it was to receive. According to defendants, that finding was incorrect and in any event, AMS bargained for a co-generation system from Helios and not just the equipment that was delivered.

We conclude that even if the judge was wrong, defendants' contention in this regard did not establish a material issue of fact. While AMS did contract for a system, it is undisputed that plaintiff only made payment to Helios once it received verbal verification that the equipment was "delivered and installed." Defendants were in the best position to make that determination and provided verification in accordance with its agreement with plaintiff. Plaintiff was not

19

under any obligation beyond waiting for defendants' verification before releasing funds to Helios.

C.

Defendants next challenge the motion judge's sixth bullet point, finding that defendants ratified their "[a]greements with [p]laintiff." Defendants concede that they authorized the payments to be made in October 2014, but were only notified "as of March[] 2015 . . . that the [co-generation] system would work." Under these circumstances, we conclude defendants' contention is meritless.

Other than their arguments about an agency relationship between plaintiff and Kunish or Helios, defendants offer no legal support for their argument that the discovery of that fraud somehow rescinded the ratification of their agreements with plaintiff through Mazandarani verifying "delivery and installation" of the system and AMS allowing payments to be made from its account. When a party to a contract is confronted with knowledge of fraud, "if by his conduct he affirms the contract, he cannot be heard to say that he did not 'voluntarily' or 'intentionally' relinquish his right to call off the deal." Merchs. Indem. Corp. v. Eggleston, 37 N.J. 114, 131 (1962) (quoting Massachusetts Accident Co. v. Stone, 127 N.J. Eq. 97, 100 (1940)).

20

Defendants knew the equipment was not installed and failed to take any action. To the extent defendants had any right to "call off the deal," they took no action for a prolonged period thereby giving up that right.

### D.

We turn our attention now to defendants' argument about the motion judge's "penultimate point," that plaintiff was under no duty to protect defendants from Kunish's or Helios's fraudulent conduct, and that if plaintiff followed its own internal guidelines completely, it might have prevented defendants' loss. They argue that the "hell or high water" provisions in their agreements should not be enforced because plaintiff voluntarily assumed a duty to protect defendants through issuing internal security policies. Defendants concede there is no legal support for their position and argue that the "[r]esolution of this first-impression issue should have awaited the creation of a complete and nuanced record at a plenary trial."

In support of their argument, defendants rely upon Litton's deposition testimony that plaintiff's internal procedures were designed to protect plaintiff and its customers. Notably, Litton explained that plaintiff's policies were to insure "first and foremost" that plaintiff was protected and that it was not entering into transactions that would "blow up in [its] face" by "accepting

21

deals that are fraudulent [and] could potentially . . . cause a customer to not want to pay us."

We conclude that Litton's testimony did not establish any factual issues that prevented summary judgment from being awarded, as it did not establish plaintiff was negligent. Plaintiff neither owed nor assumed any legal duty to protect defendants from Kunish's or Helios's actions.

"To recover under a negligence theory, it is paramount that a defendant first owe the plaintiff a duty." Kernan v. One Wash. Park Urban Renewal Assocs., 154 N.J. 437, 445 (1998); see also Globe Motor Car v. First Fidelity, 273 N.J. Super. 388, 393 (Law Div. 1993) ("Generally, to establish a negligence claim there must be a finding that the defendant owed some duty to the party complaining and a breach of that duty."). The question of whether one party owes a duty to another is a question of law that has "traditionally been the responsibility of the courts." Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439 (1993) (citing Kelly v. Gwinnell, 96 N.J. 538, 552 (1984)).

> Whether a person owes a duty of reasonable care toward another turns on whether the imposition of such a duty satisfies an abiding sense of basic fairness under all of the circumstances in light of considerations of public policy. That inquiry involves identifying, weighing, and balancing several factors -- the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise

22

care, and the public interest in the proposed solution. The analysis is both very fact-specific and principled; it must lead to solutions that properly and fairly resolve the specific case and generate intelligible and sensible rules to govern future conduct.

[Davis v. Devereux Found., 209 N.J. 269, 293 (2012) (quoting Hopkins, 132 N.J. at 439).]

The relationship between defendants and plaintiff as debtor and creditor did not give rise to any duty being owed by plaintiff to defendant. We have recognized that the interests of the parties on the opposite side of a loan transaction are inherently adversarial. United Jersey Bank v. Kensey, 306 N.J. Super. 540, 553 (App. Div. 1997). While the lender wishes to obtain the greatest security and the highest interest rate, the borrower seeks to obtain the greatest amount of money at the lowest cost. See ibid. "[I]t would be anomalous to require a lender to act as a fiduciary for interests on the opposite side of the negotiating table because their respective positions are essentially adversarial." Ibid. (citations omitted) (holding that the plaintiff had no duty to disclose to defendant appraisals, valuing assets at significantly less than the amount at which defendant purchased them). "[I]mposing a duty on a bank that would obligate it to be responsible for its depositor's financial affairs would be impractical as a matter of public policy." Globe Motor, 273 N.J. Super. at 394.

23

Courts have recognized three contexts in which a duty may arise:  where the parties have a fiduciary relationship; where special circumstances necessarily imply the presence of "trust and confidence"; and contracts which are "intrinsically fiduciary" in nature.  <u>United Jersey Bank</u>, 306 N.J. Super. at 551 (quoting <u>Berman v. Gurwicz</u>, 189 N.J. Super. 89, 93-94 (Ch. Div. 1981)).  Absent egregious circumstances involving a lender's "gross acts of misconduct and deceit," <u>id.</u> at 554, or where "the lender encourage[s] the borrower to repose special trust or confidence in its advice, thereby inducing the borrower's reliance," <u>id.</u> at 555, there is no added duty to a borrower when a lender "simply [takes] appropriate steps on its own behalf" to protect itself in the transaction.  <u>Rzepiennik v. U.S. Home Corp.</u>, 221 N.J. Super. 230, 238 (App. Div. 1987).

There is no evidence that any of those circumstances exist in this matter.  We are not persuaded otherwise by defendants' contentions about the formulation and implementation of plaintiff's policies relating to its internal assessments of vendors in transactions in which plaintiff is supplying the financing.  The motion judge correctly concluded that there was no duty that was owed by plaintiff to defendants.

IV.

Defendants also argue that the amount the motion judge awarded as damages was in excess of what was owed by them to plaintiff. Defendants correctly contend that the motion judge did not "expressly address" their arguments when he awarded $53,189.00 to plaintiff for compensatory damages, although defendants did not raise an objection to the amount sought by plaintiff on summary judgment.

According to a certification filed by plaintiff in support of its motion, $43,942.07 was demanded as due and owing as of February 1, 2017, under Agreement #1, "plus accruing interest," based upon defendants' failure to make any payments beginning on October 1, 2015. As to the second agreement, plaintiff certified that $9246.93 was owed.[5] After entry of that judgment, defendants moved for reconsideration, arguing that the amount fixed by the motion judge was incorrect and, as already noted, the judge denied their motion.

---

[5] A January 27, 2016 statement, attached to plaintiff's supporting certification, indicated the balance owed was $46,460.64 on the first agreement, calculated as the total scheduled payments $58,075.80, less $11,615.16 in payments through October 1, 2015. As to the second agreement, the same type of records stated that defendants owed $9863.30 based upon total scheduled payments of $11,166, less payments made of $1302.70.

Defendants again argue that because Mazandarani only confirmed the delivery of the equipment and its payment, and because Helios never installed the equipment, Mazandarani never authorized the portion of the amount financed that was attributable to Helios's soft costs. For that reason, plaintiff was only entitled to be paid $25,075 on the first agreement and $1000 on the second, less payments it made under both agreements that totaled $14,138.46, leaving a balance owed of $11,936.54. We disagree.

At the outset, we observe that because defendants never raised any issue about the amount being claimed by plaintiff in response to the summary judgment motion, we do not consider the matter properly raised before us. "Filing a motion for reconsideration does not provide the litigant with an opportunity to raise new legal issues that were not presented to the court in the underlying motion." Medina v. Pitta, 442 N.J. Super. 1, 18 (App. Div. 2015). We will not address on appeal an issue that defendant did not properly raise in the trial court. See Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973). Even if we did, defendants' contention that Mazandarani's authorization for the release of funds by plaintiff to Helios was limited to the cost of the equipment is without any merit, especially in light of the authorization that did not limit

the amount to be released, and AMS's monthly repayments towards the total amount owed.

V.

Defendants' next contention challenges the dismissal of their counterclaim, seeking damages under the CFA against plaintiff. In the motion judge's decision, he found the undisputed facts that neither Mazandarani nor anyone else from AMS met with or had any contact with anyone representing plaintiff and that any false promises or misrepresentation was committed by Kunish or Helios.

On appeal, defendants maintain that the record supports a finding that plaintiff employed "unconscionable commercial practices" in violation of the CFA. We disagree.

The CFA provides, in relevant part:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

27

[N.J.S.A. 56:8-2.]

"Sale" in the CFA is defined to "include any sale, rental or distribution, offer for sale, rental or distribution or attempt directly or indirectly to sell, rent or distribute."  N.J.S.A. 56:8-1(e).

The CFA applies to claims by business entities as well as consumers. Hundred E. Credit Corp. v. Eric Shuster Corp., 212 N.J. Super. 350, 354-57 (App. Div. 1986); see also Dreier Co. v. Unitronix Corp., 218 N.J. Super. 260 263-64, 273 (App. Div. 1986) (applying the CFA to a business's purchase, after finding that the plaintiff's company "had no knowledge or expertise in the computer field and . . . relied upon [the defendants] to provide a system to meet [the] plaintiff's particular needs," and therefore, the plaintiff was "just as vulnerable to unconscionable business practices as a private consumer").

Here, there was no evidence that plaintiff employed any unconscionable commercial practice.  Therefore, in order for defendants to have succeeded on their CFA claim they had to establish the agency relationship between plaintiff and Kunish or Helios, which the motion judge and we have found to not exist. Without such evidence, defendant's CFA claim was not viable and the motion judge properly dismissed the counter-claim with prejudice.

28

## VI.

Finally, we address defendants' challenge to the motion judge's award of $31,362.50 in attorneys' fees to plaintiff under "[p]aragraph [nine] of both [a]greements" that, as the judge found, "permit a counsel fee award to [p]laintiff if same was incurred, reasonable and necessary to collect the moneys owed under the [a]greements." On appeal, defendants argue that the judge provided no reason for the amount of attorneys' fees awarded. Plaintiff argues that it was clearly entitled to attorneys' fees by contractual agreement, that their request for such fees was unopposed during the summary judgment proceedings, and that the fees are not excessive.

On appeal, we will disturb the award "only on the rarest of occasions, and then only because of a clear abuse of discretion." Litton Indus., Inc. v. IMO Indus., Inc., 200 N.J. 372, 386 (2009) (quoting Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 444 (2001)).

We agree with the motion judge and plaintiff that under the two agreements, plaintiff was entitled to an award of attorneys' fees and costs. However, merely attaching copies of its bills for the judge's consideration did not satisfy plaintiff's obligation to support its application with information the

judge needed in determining whether the fees incurred were reasonable under Rule 4:42-9.

Although "New Jersey disfavors the shifting of attorneys' fees . . . 'a prevailing party can recover those fees if they are expressly provided for by statute, court rule, or contract.'" Id. at 385 (quoting Packard-Bamberger, 167 N.J. at 440) (citing N. Bergen Rex Transp., Inc. v. Trailer Leasing Co., 158 N.J. 561, 569 (1999)). "When the fee-shifting is controlled by a contractual provision, the provision should be strictly construed in light of our general policy disfavoring the award of attorneys' fees." Ibid. (citing N. Bergen, 158 N.J. at 570).

If the provision does indeed provide for an award of attorneys' fees, a court must analyze whether the requested award is reasonable. See id. at 386. "The reasonableness of attorney's fees is determined by the court considering the factors enumerated in [Rule] 4:42-9(b). That rule incorporates the factors stated in R.P.C. 1.5." McGowan v. O'Rourke, 391 N.J. Super. 502, 508 (App. Div. 2007). In order to enable a court to make that determination, the Rule requires in "all applications for the allowance of fees shall be supported by an affidavit of services addressing the factors enumerated in [RPC] 1.5(a)." R. 4:42-9(b).

Upon the filing of the required affidavit, the court must first determine "whether the party seeking the fee prevailed in the litigation," and second, the court must "calculate the 'lodestar,' which is that number of hours reasonably expended . . . multiplied by a reasonable hourly rate." Litton Indus., Inc., 200 N.J. at 386 (first quoting N. Bergen, 158 N.J. at 570; and then quoting Furst v. Einstein Moomjy, Inc., 182 N.J. 1, 21 (2004)). In calculating the lodestar, courts are required to consider:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3) the fee customarily charged in the locality for similar legal services;
>
> (4) the amount involved and the results obtained;
>
> (5) the time limitations imposed by the client or by the circumstances;
>
> (6) the nature and length of the professional relationship with the client;
>
> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services;
>
> (8) whether the fee is fixed or contingent.

A-3813-17T4

[Id. at 387 (quoting R.P.C. 1.5(a)).]

A proportionality analysis may be required "in cases in which the fee requested far exceeds the damages recovered," however, "[t]he ultimate goal is to approve a reasonable attorney's fee that is not excessive." Id. at 387-88.

Once a court makes a determination as to the reasonableness and amount of an applicant's fees and costs, it must set forth its findings in an oral or written decision as required under Rule 1:7-4 to allow for meaningful appellate review. See S.N. Golden Estates, Inc. v. Cont'l Cas. Co., 317 N.J. Super. 82, 91 (App. Div. 1998).

Here, although paragraph nine of both agreements established plaintiff's entitlement to an award of fees and costs under the circumstances, neither plaintiff's counsel nor the motion judge followed the requirements of our rules. Although plaintiff's attorneys certified that they incurred $68,461.35 in attorneys' fees and costs, they did not file any certification that comported with Rule 4:42-9(b) and R.P.C. 1.5. The motion judge made no findings about the reasonableness of the fees once he determined that plaintiff was entitled to an award of fees under the agreements.

Under these circumstances and despite defendants' failure to object to the fee application in its opposition to plaintiff's summary judgment motion,

we are constrained to remand the award of fees for reconsideration, after the submission of an affidavit of services that complies with the Rule 4:42-9(b) and defendant is given an opportunity to respond. Thereafter, the motion judge is to issue a decision that comports with Rule 1:7-4. The remand must be complete within thirty days.

Affirmed in part and remanded in part for further proceedings consistent with our opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

33

A-3813-17T4